UNITED STATES of America,
Plaintiff–Appellee,

v.

Dalton BROWN (97–1220) and Yvonne
Meadows (97–1245), Defendants–
Appellants.

Nos. 97–1220, 97–1245.

United States Court of Appeals,
Sixth Circuit.

Argued March 10, 1998.

Decided July 17, 1998.

John L. Belanger (argued and briefed), Sterling Heights, Michigan, for Defendant–Appellant Dalton Brown.

Godfrey J. Dillard (argued and briefed), Evans & Luptak, Detroit, Michigan, for Defendant–Appellant Yvonne Meadows.

Kathleen Moro Nesi (argued and briefed), Asst. U.S. Attorney, Office of the U.S. Attorney, Detroit, Michigan, for Plaintiff–Appellee.

Before: RYAN, COLE, and GILMAN, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which COLE, J., joined. GILMAN, J. (pp. 490–92), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

RYAN, Circuit Judge.

The defendants, Dalton Brown and Yvonne Meadows, were convicted by a jury on multiple counts, described in detail below, all arising out of alleged corruption in the Detroit Housing Department. Their appeals challenge their convictions on only one group of counts: those charging that the defendants made false statements to a federal agency, in violation of 18 U.S.C. § 1001. In addition, Brown argues that the district court erred in calculating the amount of loss for sentencing purposes.

We shall affirm the district court's judgment of conviction with respect to Brown, as well as his sentence. We shall reverse the judgment of conviction with respect to Meadows, however, on the ground that the government failed to produce sufficient evidence of Meadows's *mens rea*.

### I.

### A. Section 8 Regulatory and Statutory Background

This case centers on the misuse of public housing funds by employees of the Detroit Housing Department, or DHD, in connection with the "Section 8 housing" program. Section 8 housing derives its name from Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, which provides that the Secretary of HUD may enter "annual contributions contracts" with public housing agencies, through which the PHAs—of which the DHD is one—obtain federal funding to enable low-income families to enter the housing market and rent existing dwelling units from private landlords.

The purpose of Section 8 housing assistance is "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437. Under the program, qualifying tenants pay a portion of their income to a private landlord, and in order to meet market-level rents, the PHA makes additional "assistance payments" to the landlord with the federal funds it receives from HUD. *See* 42 U.S.C. §§ 1437a(a), 1437f(b), (c), and (o).

To participate in the Section 8 program, would-be recipients must apply to the local PHA, which determines eligibility based on a number of financial and family-status factors. The PHA also evaluates applicants with respect to three federal preferences, given to (1) families who occupy substandard housing; (2) families who are involuntarily displaced; and (3) families who are paying more than 50% of their income for rent. *See* 24 C.F.R. §§ 882.219, 887.157.

If an applicant is selected to participate in the Section 8 program, the local PHA issues the family a "certificate" or a "voucher,"

either of which entitles them to benefits. The certificate system and the voucher system are substantially similar, *see* 24 C.F.R. §§ 882.102, 887.7; the primary difference between them is the manner of calculating how much rent a participating family must pay. Once a PHA issues a certificate or a voucher, the recipient may use it to pay the rent for any apartment he or she chooses so long as the landlord participates in the Section 8 program. The recipient gives the certificate or voucher to the landlord, who in turn presents it to the PHA, which in turn pays the balance of the rent; HUD then reimburses the PHA.

Certificates and vouchers all contain language stating that "[t]he PHA has determined that the Family is eligible to participate" either in the certificate or the voucher program. The forms require certain simple information to be filled in blanks: (1) the size of unit for which the recipient is eligible (that is, one, two, or three bedrooms); (2) the issuance and expiration dates for the certificate or voucher, along with any extensions; (3) the name of the "family representative" in whose name the form is issued, and that person's signature; and, finally, (4) the name of the PHA, and the name, title, and signature of the issuing PHA official.

At issue in this case is the intermediate step between an application and the issuance of Section 8 subsidies: that is, the selection of a particular applicant for receipt of a certificate or voucher. The government takes the position that the applicable regulations require the DHD to place those applicants who qualify on a waiting list, and to select applicants in a particular order. The theory of its prosecution is that Brown and Meadows ignored this regulatory requirement, instead giving benefits to people based on improper and impermissible considerations. The government further asserts that in signing and issuing the certificates or vouchers, the defendants represented that the PHA had determined a recipient's "eligibility," and that the definition of "eligible" necessarily includes a representation that the recipient came off of a waiting list. Since the recipients in question did *not* come off of a waiting list—which fact is not contested by the defendants—the government contends that the defendants, in representing the applicants' eligibility, made a false statement in violation of 18 U.S.C. § 1001.

## B. Actions of Brown and Meadows

The defendants, Brown and Meadows, were both employees of the DHD; they were also, to use Meadows's phrasing, "personal friends." Meadows was a "housing eligibility investigator," and her job responsibilities were to "process[ ] individuals for the Section 8 program, verifying income, verifying identity, birth certificates, that type of thing," as well as to arrange for housing inspections and to draft leases. Meadows's personnel file contained a certificate dated October 1991 showing that she had satisfied the training requirements for her position; no evidence was presented, however, as to what the precise training requirements were.

Brown, on the other hand, was appointed by Mayor Coleman Young in October 1992 to be superintendent of housing operations and maintenance. As superintendent, Brown was responsible for the management and maintenance of all of Detroit's public housing properties. In March 1993, Brown received a new assignment, and assumed the duties of administering the Section 8 program.

It is undisputed that the DHD was in a state of chaos and mismanagement long before the events at issue here. In June 1991, HUD began investigating the Section 8 program in Detroit, and in January 1993, HUD decided to provide assistance to the DHD in order to allow Detroit to continue administering the program. The alternative was for HUD to take the program over itself. There was testimony at trial that HUD directed its attention to the DHD's outdated and improper waiting-list format. Although the DHD did have a waiting list at the time, it was kept in a manner that made it impossible to tell who was next on the list. There was testimony from Martha Alexander, a former employee who had been in charge of the waiting list, that when she began working in October 1990, the waiting list "did not contain the necessary information required to keep [it] as a working tool." Specifically,

[t]here was no identification of individuals as related to race. Their federal preferences was [sic] not stated. There was no room for comments and there was no room to suggest that any activity had taken place on this list.

Moreover, although the list had been officially "closed" in 1988, it was apparent that names had in fact been added after that time.

Alexander was instructed to "purge" the list, contacting the applicants to verify that they were still interested in receiving Section 8 subsidies; this occurred between April and December 1992, and the list was eventually reduced to 436 names. The updated, purged list contained the information that HUD requires.

As another part of the effort to remedy the problems with the waiting list, the DHD's employees, including Brown, were shown various training videotapes and provided with pamphlets and booklets. There is no evidence, however, that Meadows ever saw videos or received pamphlets; further, the witness who testified about this training never actually testified that the training materials discussed the use of a waiting list. It is clear, however, that Brown requested and received a manual of relevant regulations, some of which—as will be discussed in greater depth below—refer to the use of waiting lists. Further, although there was no evidence about the specific content of the discussions, there *was* evidence that Brown discussed waiting lists with a HUD representative about six times. Finally, it is undisputed that there was a sign on the exterior door to the DHD office informing that the "Section 8 Housing waiting list is closed," and that no further applications were being accepted.

There is one final piece of significant evidence regarding Brown's knowledge of the waiting list. In November 1993, Brown submitted an "administrative plan" to HUD on behalf of the DHD. The purpose of the plan was to "set[ ] into policy and procedures those areas a Housing Authority has discretion in, such as order of tenant selection." Such plans are required by the applicable regulations, and they are used by a PHA to administer its programs. One witness de-

scribed it as "a living document ... [A]s rules and regulations change, or Housing Authorities wish[ ] change within their areas of discretion, [the plan] will be updated and changed." The plan submitted by Brown contained the following:

Establishing Preferences and Maintaining the Waiting List. . . .

The Detroit Housing Department, Section 8 Office will adhere to the guidelines set forth in the CFR regarding federal preferences and the waiting list.

Between January 1993 and June 1994, the DHD was under orders from HUD to freeze rental activity and not issue any certificates or vouchers. These orders were disregarded by Brown, who continued both to add names to the waiting list and to issue certificates and vouchers. It is clear that Brown was the only employee with authority to issue certificates and vouchers; Meadows had no such authority.

The details as to whom certificates and vouchers were issued, and under what circumstances, are very unclear from the briefs; reading the excerpted transcripts from this month-long trial does not add much clarity. It is readily apparent, however—and there is no dispute on this point—that a number of certificates and vouchers were improperly issued to people who would not have been selected from the waiting list in the absence of impermissible considerations. Some certificates and vouchers were issued as favors to political cronies; some were issued to friends and family members of Meadows; some were issued to people legitimately on the waiting list but not actually entitled to receive certificates or vouchers, as an attempt by Brown to dispel suspicion. And it is undisputed that some were issued as a result of bribes. In early 1994, Brown was introduced to Maxine Floyd, who paid a series of bribes to Brown in order to obtain his assistance in finding Section 8 housing for senior citizens on whose behalf Floyd was acting; in return, Brown instructed that certificates or vouchers be issued.

Four of the housing vouchers for which Brown and Meadows were indicted were issued to friends and family members of defen-

dant Meadows. One voucher was issued in September 1993 to Joya Craighead, who had been a friend of Meadows for 16 years. Craighead testified that she spoke with Meadows about her need for housing, but Meadows "didn't tell [her] anything in regards to what [she] should do." Craighead later went to the DHD, spoke with Brown, and about three weeks later, was "processed into the program," receiving a voucher signed by Brown. Craighead testified that Meadows did not work on her application. Craighead also testified that she asked Brown for help in finding housing for her niece, Tamika Craighead; Joya and Tamika met at Brown's house, along with Meadows, and Brown told her he "would look into it"; there is no evidence that Meadows, although present, took part in the conversation. Joya Craighead also testified that while she was "sure" she talked to Meadows regarding Tamika's entry into the Section 8 program, Meadows simply told her that Joya would have to speak directly with Brown. Tamika received a voucher in April 1994, which voucher was signed by Brown.

Finally, Meadows's mother, Deloris Meadows, received a voucher in September 1993, and her sister, Yvette Johnson, received a voucher in December 1993. Defendant Meadows brought her mother the necessary papers to sign and then handled the application process; with respect to her sister, Meadows instructed her to meet with Brown, and someone else filled out the paperwork. Both vouchers were signed by Brown.

HUD began an investigation of the DHD's Section 8 program in June 1994, and attention soon focused on Brown.

## C. The Prosecution

In January 1996, Brown and Meadows were named in a 50–count indictment. Brown was charged with two counts of conspiracy to commit an offense against the United States, specifically, soliciting and receiving money to act in violation of official duties and using false documents in a matter within the jurisdiction of a department of the United States, in violation of 18 U.S.C. § 371 (Counts 1 and 46); one count of accepting money with regard to a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) (Count 2); 23 counts of accepting money to do an act in violation of official duty, in violation of 18 U.S.C. § 201(b)(2)(C) (Count 3 through 25); and 24 counts of using and/or causing the use of false documents in a matter within the jurisdiction of a department of the United States, in violation of 18 U.S.C. §§ 1001, 2(a) & (b) (Counts 26 through 45 and 47 through 50). Meadows was charged with one count of conspiracy to commit an offense against the United States, specifically, using false documents in a matter within the jurisdiction of a department of the United States, in violation of 18 U.S.C. § 371 (Count 46), and four counts of using false documents in a matter within the jurisdiction of a department of the United States, and aiding and abetting thereof, in violation of 18 U.S.C. §§ 1001, 2(a) & (b) (Counts 47 through 50). The § 1001 counts in which Meadows was named alleged that the defendants "used a false document knowing the same to contain false, fictitious, and fraudulent statements," specifically, "a false HUD document entitled Housing Voucher which stated that the Public Housing Agency ('PHA') has determined that a particular family was eligible to participate in the PHA's Section 8 Housing Voucher Program whereas Dalton Brown, defendant herein, then knew that such statements were false, fictitious and fraudulent." The indictment does not explicitly mention the government's theory that the meaning of "eligible" includes a representation that the applicant came off of a waiting list, nor does it assert that Meadows knew of the falsity of the statements.

A month long trial began in September 1996. The defendants moved for judgments of acquittal following the close of the government's proofs, and the court took the motions under advisement; the defendants then renewed their motions after the jury returned its verdict, at which time the district court denied them. The court asserted that the regulations applicable to Section 8 "require that local housing authorities maintain a waiting list of qualified applicants," and that the regulations further "require that families be taken in order from the waiting list, with

appropriate weight given to qualification preferences." And "since none of the families involved in the charges in Counts 26–45 and 47–50 came from or were ever on the waiting list, the statement [of eligibility] would be an express false assertion, even though the information concerning the family was otherwise true, and the family was in fact 'eligible' in terms of income and related criteria." Alternatively, the court held, the statements were implied false assertions.

Meadows was convicted on all counts with which she was charged, and received a sentence of 12 months' imprisonment on each count, to be served concurrently. She does not challenge her sentence in this appeal. Brown was convicted on all but one of the counts with which he was charged, that is, Counts 1 through 24 and 26 through 50. His resulting 72–month sentence will be discussed in greater detail below.

## II.

### A.

■ Brown argues that although he did favors for people by placing them in the Section 8 program, he never made a literally false statement in order to do so. Everyone who was placed in the program was eligible with respect to financial status and other criteria; thus, the government failed to meet its burden with respect to a critical element of the offense. Meadows, too, argues that the representations of "eligibility" were not literally false. We interpret this argument as a purely legal challenge regarding the scope and meaning of 18 U.S.C. § 1001 and the applicable housing regulations. "The interpretation of a statute is a question of law which this court reviews *de novo.*" *United States v. Khalife,* 106 F.3d 1300, 1302 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

■ Meadows advances a second argument as well: in essence, that she lacked the necessary *mens rea.* She contends that she was inadequately trained, and ignorant of the existence or function of the Section 8 waiting list; the DHD was completely chaotic and disorganized, and no employee, including Meadows, knew what was expected. This is

a traditional sufficiency-of-the-evidence challenge, and its proponent necessarily carries a heavy burden. *See United States v. Wright,* 16 F.3d 1429, 1439 (6th Cir.1994).

> When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.

*United States v. Riffe,* 28 F.3d 565, 567 (6th Cir.1994); *see also Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### 1.

We review the defendants' legal challenge first, which requires a review of the complex regulatory background.

Two sections of the Code of Federal Regulations pertain to this discussion: the rules governing the Section 8 certificate program are found in 24 C.F.R. § 882, while the rules pertaining to the housing voucher program are found in section 887. The two sections have, in relevant part, identical or substantially similar language.

The regulations require that a PHA prepare an administrative plan as a condition of entering into an annual contributions contract, or ACC, with HUD, and further require that the plan describe the administrative details of the Section 8 program—including a description of the waiting list. *See* 24 C.F.R. §§ 882.204, 887.61. There are, however, no explicit regulatory requirements for the maintenance, composition, or operation of the waiting list. *See, e.g., id.* §§ 91.17(b)(1)(ii), 91.42(b)(1)(ii). And although there are explicit federal preferences, it is clear that PHAs have discretion to adopt local preferences in addition to the mandatory federal preferences. *See* 42 U.S.C. § 1437f(*o*)(3). Too, a PHA may provide for circumstances in which families who do not qualify for federal preferences are nonetheless provided assistance before families who *do* so qualify. *See id.* § 1437f(*o*)(3)(B). And likewise, PHAs may

give priority to applicants who qualify for both federal and non-federal preferences over applicants who qualify only for federal preferences. *See* 24 C.F.R. §§ 882.219(b)(2)(iii)(A), 887.157(b)(2)(iii)(A) (1993). The administrative plan submitted by Brown on behalf of the DHD, however, is straightforward; it simply adopts "the guidelines set forth in the CFR regarding federal preferences and the waiting list."

Moreover, while the regulations provide only the minimal framework for the formulation of a waiting list, it is clear that they presuppose the existence of *some* waiting list for every PHA. For example, one regulatory section which delineates the PHA's responsibilities includes the maintenance of a waiting list. *See id.* §§ 882.116(c), 882.209(a)(7).

As a secondary matter, the regulations provide no straightforward definition of the term "eligible." Part 813, for example, sets forth eligibility requirements, and being on the waiting list is not one of them. In section 813.101, the term "eligibility" is used simply to refer to financial and family-status consideration. The same use of the term is found in section 882.116, which refers to "verification of family income and other factors relating to eligibility," and in section 882.209(a)(7), which refers to "income-eligible Families."

In any event, the most complete discussion of the guidelines for selecting recipients is found in section 882.209. We find the following provisions significant:

(7) *The PHA shall maintain a waiting list of income-eligible Families that have applied for participation in the PHA's Section 8 program.* Subject to any obligation to use Certificates to ensure the availability of assistance under one of the uses prescribed in paragraph (a)(4)(ii)(B) of this section, *the PHA shall select applicants for participation from the waiting list in accordance with policies and procedures (including any Federal preferences under § 882.219) stated in the administrative plan or equal opportunity housing plan. Notwithstanding the fact that the PHA may not be accepting additional applications for participation because of the length of the waiting list, the PHA may*

*not refuse to place an applicant on the waiting list if the applicant is otherwise eligible for participation and claims that he or she qualifies for a Federal preference as provided in § 882.219(c)(2),* unless the PHA determines, on the basis of the number of applicants who are already on the waiting list and who claim a Federal preference, and the anticipated number of Certificates to be issued, that—

(i) There is an adequate pool of applicants who are likely to qualify for a Federal preference and,

(ii) It is unlikely that, on the basis of the PHA's system for applying the Federal preferences, the preference or preferences that the applicant claims, and the preferences claimed by applicants on the waiting list, the applicant would qualify for assistance before other applicants on the waiting list.

(8) If there is insufficient funding to admit all eligible applicants to participation in the PHA's Section 8 program, the PHA may at any time suspend the acceptance or processing of new applications, or the addition of new listings to the waiting list. Any such suspension shall be publicly announced by the PHA through publication in a newspaper of general circulation as well as through minority media and other suitable means.

. . . .

(b) Issuance of Certificate of Family Participation and Certificate Holder's Packet. (1) *When the PHA determines there is sufficient funding, the PHA shall issue a Certificate to an applicant on the waiting list.*

*Id.* § 882.209 (emphasis added); *see id.* § 887.155.

We turn next to the false-statement prohibition of 18 U.S.C. § 1001. Brown was charged with causing a violation of § 1001, while Meadows was charged with aiding and abetting, all in violation of 18 U.S.C. § 2.

 Section 1001 "protects the authorized functions of the various governmental departments from any type of deceptive practice," *United States v. Corr*, 543 F.2d

1042, 1048 (2d Cir.1976), and provides as follows:

### 1001. Statements or entries generally

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) *makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;*

shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001 (emphasis added). Thus, the elements of this crime are

(1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of the statement; (4) relevance of such statement to the function of a federal department or agency; (5) that the false statement was material.

*United States v. Aarons,* 718 F.2d 188, 190 (6th Cir.1983). It is not necessary, however, for the government to show that a statement was made with actual knowledge of federal agency jurisdiction. *See United States v. Yermian,* 468 U.S. 63, 68–69, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984). "By its terms, 18 U.S.C. § 1001 covers 'any' false statement— that is, a false statement 'of whatever kind.'" *Brogan v. United States,* — U.S. —, —, 118 S.Ct. 805, 808, 139 L.Ed.2d 830 (1998) (citation omitted).

In *United States v. Shah,* 44 F.3d 285 (5th Cir.1995), the Fifth Circuit devoted some attention to the "'requisite specific intent'" of § 1001. *Id.* at 289 (citation omitted). The court observed that "'[a] false representation is one ... made with an intent to deceive or mislead.'" *Id.* (citation omitted). The statute does not, however, "'require an intent to defraud—that is, the intent to deprive someone of something by means of deceit.' In

this sense, the False Claims Act seeks to protect more than the simple proprietary interests of the federal government; it 'has for its object the protection and welfare of the government.'" *Id.* at n. 7 (citation omitted). It is clear that if a defendant "'deliberately ignore[s] a high probability that [a] form contain[s] material false information,'" *United States v. Arnous,* 122 F.3d 321, 323 (6th Cir.1997) (citation omitted), the requisite specific intent has been established.

The case from this court that most directly addresses the defendants' contentions is *United States v. Waechter,* 771 F.2d 974 (6th Cir.1985), although the statute being construed there was 18 U.S.C. § 1010, which prohibits false statements made for the particular purpose of gaining advantage over HUD. There, the government prosecuted a real estate investor for alleged false statements he made involving bids he submitted for houses being sold by HUD. It was the defendant's practice to submit multiple bids for a single property, without revealing that he controlled all the bids. The court held that this scheme did not "involve[ ] making either express or implied statements to HUD that were false." *Id.* at 975. It explained:

A documentary factual assertion may be either express or implied. An express statement will appear on the face of the document that asserts the factual proposition. First, the express factual assertion may be an affirmative statement.

Second, the express factual assertion may arise when the omission of information expressly sought by a document is combined with a signature certifying the completeness or truthfulness of the information provided in the document.

An implied factual assertion does not appear on the face of a document. Instead, use of a document makes a factual assertion of those propositions that are necessarily implied by the system of statutes, regulations, and announced policies which created the document....

. . . .

... [W]e hold that use of a document makes the factual assertions necessarily implied from the statutes, regulations, and

announced policies that created the document.

*Id.* at 978–79 (citations omitted). The *Waechter* court first concluded that "the bids placed on behalf of Waechter contained no express affirmative false statements," *id.* at 979, and then turned to the implied-statements test.

> [T]o determine whether Waechter's bids made implied statements that were false we evaluate the necessary implications of the system of bidding that HUD established by its announced policies. HUD's policies under the Detroit pilot program did not prohibit a person from using agents to place bids on one's behalf as an undisclosed principal. HUD policies neither prohibited nor required disclosure of the fact that a person was using multiple d/b/a names to bid on houses offered through the pilot program. Nor did HUD policies prohibit a person from withdrawing a bid for any reason or no reason.

*Id.* at 979–80. Thus, the court reasoned, Waechter had not made an implied false assertion.

■ We believe that the defendants are incorrect insofar as they suggest that an implied false statement cannot be the basis for a conviction under § 1001. While no case law is directly on point, we conclude that the body of law, in the aggregate, makes plain that implied falsity is a basis for a conviction. This point was certainly settled by *Waechter* in the § 1010 context, and we can conceive of no reason why § 1001 should operate differently. But we believe the government is also incorrect insofar as it argues that the defendants made an *express* false statement by affirming that the various recipients were "eligible." The meaning ascribed to "eligible" by the government derives wholly from the regulations; it is not the prevailing common usage of the term, or one that would be automatically understood simply by reading the text of the certificates or vouchers. Thus, the government's theory only holds up if the regulations do in fact define eligible as, among other things, being on the waiting list. But if the regulations *do* define the term this way, it is not a problem for the government's prosecution that the false statement was implied rather than express, and given content only by the regulations.

■ We turn, then, to the more difficult question: does "eligible" mean being on the waiting list? The meaning of "eligible" in the regulations is arguably ambiguous. Likewise, it seems problematic for the government's theory that although the federal preferences provide some boundaries for any waiting list, a PHA has wide discretion to devise its own preferences. We are also troubled by the government's cavalier discussion of the regulatory requirements; the government mentions the administrative plan only briefly, and never confronts the wide discretion accorded to PHAs in devising and implementing the plan.

But on the whole, we are confident that the only sensible understanding of "eligibility" in this context includes the use of a waiting list. In this regard, we find illuminating the discussion of the district court in denying the defendants' motion for acquittal:

> [T]he statutes, regulations, and announced policies that created the housing vouchers and certificates were all established to provide subsidized housing for needy families through an impartial system based on degree of need and time of application. The inability to assist all who would qualify and request assistance demands that the allocation system be based on straightforward neutral factors: date of application, percentage of income currently spent on housing, current housing situation, etc. The waiting list procedure was established to ensure this neutral application. Thus, the use of housing vouchers and certificates necessarily implied that the persons possessing those documents were eligible for assistance through the neutral regulatory system which assures fairness and even-handedness in the allocation of scarce resources.

We note, too, an abundance of evidence that Brown was well aware of the existence and role of the waiting list; there was certainly more than enough evidence for a jury to infer that when Brown signed these certificates and vouchers, he knew that the recipients were not "eligible," in the sense that the

government uses the term, and that they should have been on the waiting list before being selected.

We note, finally, that Brown has made much of the risk of abuse of § 1001, because of its potentially broad scope. In *Brogan,* the Supreme Court gave this type of argument short shrift, when it rejected the argument of a defendant that an "exculpatory 'no'" should not be the basis for a prosecution:

> The supposed danger is that overzealous prosecutors will use this provision as a means of "piling on" offenses—sometimes punishing the denial of wrongdoing more severely than the wrongdoing itself. The objectors' principal grievance on this score, however, lies not with the hypothetical prosecutors but with Congress itself, which has decreed the obstruction of a legitimate investigation to be a separate offense, and a serious one. It is not for us to revise that judgment. Petitioner has been unable to demonstrate, moreover, any history of prosecutorial excess, either before or after widespread judicial acceptance of the "exculpatory no." And finally, if there is a problem of supposed "overreaching" it is hard to see how the doctrine of the "exculpatory no" could solve it. It is easy enough for an interrogator to press the liar from the initial simple denial to a more detailed fabrication that would not qualify for the exemption.

*Brogan,* —— U.S. at ——, 118 S.Ct. at 810; *see Yermian,* 468 U.S. at 75, 104 S.Ct. 2936. We likewise reject Brown's stated concerns.

### 2.

We turn now to Meadows's sufficiency challenge.

■ Section 2 of Title 18 has two components, and provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2. Thus, a defendant can be guilty of violating 18 U.S.C. § 1001 as a principal even if the evidence does not show that she herself actually made false statements, so long as the evidence shows that she aided, abetted, counseled, induced, or procured the commission of the fraud, or, alternatively, caused the false statements to be made. *See United States v. Twitty,* 107 F.3d 1482, 1491 n. 10 (11th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 253, 139 L.Ed.2d 181 (1997). While the difference between inducing, in § 2(a), and causing, in § 2(b), is somewhat unclear, it is clear that the indictment alleged that Brown *caused* and Meadows *aided and abetted.*

■ In *United States v. Martin,* 920 F.2d 345, 348 (6th Cir.1990), this court affirmed a conviction under 18 U.S.C. § 2, explaining that "[t]o be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." (Internal quotation marks and citations omitted.) And in *United States v. Horton,* 847 F.2d 313, 322 (6th Cir.1988), the court indicated that in order to be guilty under 18 U.S.C. § 2, a defendant must "willfully participate[ ] in the commission of a crime.... Participation is willful if done voluntarily and intentionally and with the specific intent to do something which the law forbids or with the specific intent to fail to do something which the law requires to be done, that is to say, with bad purpose either to disobey or disregard the law." It is clear that to be guilty under 18 U.S.C. § 2, there must be evidence " 'that the defendant shared in the criminal intent of the principal.' " *Aarons,* 718 F.2d at 191. Thus, "to convict a person accused of making a false statement, the government must prove not only that the statement was false, but that the accused knew it to be false. Thus, the government is required to show that the misrepresentation was not made innocently or inadvertently." *United States v. Curran,* 20 F.3d 560, 567 (3d Cir.1994) (citing *United States v. Weatherspoon,* 581 F.2d 595, 601 (7th Cir.1978)).

Bearing these principles in mind, we conclude that Meadows's convictions on Counts 47 through 50 should be reversed for two reasons: first, she lacked the necessary specific intent, and second, in all but one instance, she failed to engage in the type of affirmative conduct necessary to aid or abet the commission of the § 1001 violation.

■ We note that the government's brief largely fails to respond to Meadows's argument that she lacked the necessary *mens rea.* But we have reviewed every single page of the transcript that the government says supports the proposition that Meadows was aware of the existence of a waiting list and the requirement that people be selected from that list, and conclude that while there is evidence of the former—because there was a sign on the door of the DHD stating that the waiting list .was closed—there is no evidence whatsoever that she had any understanding of the waiting list's function or purpose or proper use. Her listed job duties did not refer to the waiting list, and there was no evidence that she was trained with respect to the waiting list. The director prior to Brown, under whom Meadows had worked, had treated the waiting list in a casual fashion, at one point making an offer at a staff meeting to allow every staff member to put one favorite client on the list. Finally, this is not the type of *mala in se* offense that would lead a reasonable person to infer that Meadows *must* have known she was breaking the law; the friends and relatives that received benefits were all income-eligible, and in that sense, qualified to receive the benefits.

■ An alternative reason for reversing three of Meadows's four § 1001 counts is that there is no evidence she played any sort of active role in the predicate offenses, necessary to support an aiding-and-abetting conviction. Except in the case of her mother, to whom Meadows brought the necessary paperwork, there was no evidence that Meadows helped in the preparation of the documentation or submission of it to HUD. At most, there is evidence that Meadows may have known about the applications, but that is not equivalent to knowledge even that the representation of eligibility was being made. Her participation, in every instance except that of her mother, was not the kind of participation that can give rise to liability for aiding and abetting the *filing* of the documents because there simply was no evidence that she did any act to bring the § 1001 offenses about, or make them succeed.

■ As the government has pointed out in its brief, Meadows has not challenged her conspiracy conviction under Count 46; in fact, despite the government's observation of that fact, and its corollary observation that, as a result, a reversal on the challenged substantive counts would not change Meadows's sentence, Meadows did not file a reply brief raising a challenge to the conspiracy conviction. Nonetheless, at the very conclusion of his rebuttal argument before this court, Meadows's attorney asserted that Meadows's conspiracy conviction ought to be reversed along with the substantive counts. In the normal course of things, this would be insufficient to elude the obvious forfeiture problem, *see, e.g., United States v. Voigt,* 89 F.3d 1050, 1064 n. 4 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996); *United States v. Hayter Oil Co.,* 51 F.3d 1265, 1269 (6th Cir.1995), and we are troubled by the belatedness of this argument.

The dissent insists we ought not reach this issue since it was not timely raised and suggests that we are foreclosed from doing so by Fed. R.App. P. 28(a). Ordinarily we would agree, but we think this case presents the rare situation in which it is justified, indeed, as a matter of substantial justice, necessary to invoke the provisions of Fed. R.App. P. 2, which authorizes the "suspen[sion of] the requirements or provisions of any of these rules" in the interest of avoiding manifest injustice. We think that is so because in light of our conclusion that Meadows lacked the necessary *mens rea* to aid and abet in a violation of 18 U.S.C. § 1001, it follows inexorably that she cannot have had the requisite *mens rea* to conspire to do so. If the evidence is insufficient to support guilt of the former, it is perforce insufficient to support guilt of the latter; a finding otherwise, particularly on the procedural ground of forfeiture, would result in a manifest miscarriage of justice.

We will therefore reverse in full the judgment of conviction with respect to Meadows.

## B.

### 1.

The presentence report prepared for Brown calculated the intended loss for which he was accountable as follows:

> [T]he probation officer has reviewed information detailing the actual amounts which were paid within the Section 8 program for individuals who received their vouchers or certificates as a direct result of the defendants [sic] activities. For the determination of the intended loss, the probation officer has received information regarding the amount of assistance payments individuals who held a voucher or certificate would have been eligible to receive on a monthly basis, had they been able to use the voucher or certificate prior to the detection of this offense by authorities. The probation officer has utilized June 1994 as the start date, [when investigators learned of Brown's role in the scheme,] and November 1996 as the ending date, [when Brown was convicted,] in determining intended loss. . . .
>
> . . . .
>
> DALTON BROWN is being held accountable for actual losses of $152,960.61, and intended losses of $358,063.00, for a total loss figure of $511,023.61. This total figure will be used in the determination of loss under the sentencing guidelines. The Court should be aware that the actual loss continues to increase at a rate of $4,324.00 per month. The intended future monthly loss for those individuals who received vouchers/certificates, but did not get into the program, is equal to $12,347.00.

Thus, the "actual loss" figure represented the money which, at the time of Brown's conviction, HUD had already expended on those individuals who had improperly received Section 8 benefits through Brown; the "intended loss" figure covered those individuals who received a certificate or voucher but who did not actually receive Section 8 benefits because HUD's investigation, and discovery of Brown's activities, forestalled them.

Brown objected to the calculation of loss on the ground that "he does not meet the criteria for loss to be relevant" under the applicable guideline. The probation department disputed his objection, contending that the evidence showed that Brown intended the loss; that it was "obviously possible for him to cause the loss"; and that he "completed all acts necessary to bring about the actual and intended loss by authorizing the issuance of vouchers."

At the sentencing hearing, the district court adopted the PSR's calculation of actual and intended loss in the total amount of $511,023.61. It concluded that Brown was responsible for the actual and intended loss resulting from the issuance of certificates and vouchers to people who were not entitled to them, even when those people did not actually receive benefits; it also concluded that his responsibility for that loss terminated at the time of his conviction, since at that time, the government could have terminated the benefits of anyone it felt had improperly received them. The court noted that it was not necessary to "find an identifiable loss to HUD"; instead, all it had "to find is the diversion of funds, and clearly there was a diversion of funds here. So the fact that it was diverted to people who by economic terms might have qualified anyway doesn't really answer the question." In sum, the court found as follows:

> [W]here the loss is more than $500,000, but less than $800,000, you add ten levels, which is what I did here, and to get to that ten levels, that $500,000 mark, I took the numbers, the government's numbers, actually, that the actual loss to the date of, the conclusion of the trial was $152,960.61, and intended loss, that is, people who actually received vouchers or certificates but were not placed in the program up to the date of the conclusion of the trial was $358,063 for a total loss figure of $511,023.61.

With an additional four-level increase for being a leader or organizer, Brown was assigned a total offense level of 26. His criminal history category was I, resulting in a guideline range of 63 to 78 months, although

some counts were subject to a statutory 60–month cap. For the other counts, the court imposed a sentence of 72 months, all to run concurrently.

### 2.

Brown now challenges the district court's calculation of intended loss. The relevant question, he asserts, is whether he is "responsible for losses which theoretically occurred to those parties on the waiting list who were not placed in the program and/or for the monies which had been paid to those who continue on the program who were not on the waiting list." He argues that he actually intended no loss at all, and HUD incurred no loss because the people who received housing were eligible, in a financial sense. He further argues that HUD itself is responsible for its own losses because its program was so poorly run.

■ On the one hand, a "district court's determination of the amount of money [a] defendant wrongfully received from [a federal] agenc[y] is a finding of fact and is accepted on appeal unless the finding is clearly erroneous." *United States v. Hintzman,* 937 F.2d 1196, 1199 (7th Cir.1991). On the other, the sentencing guideline that pertains to offenses involving fraud or deceit, U.S.S.G. § 2F1.1, uses a definition of loss that incorporates the definition of loss discussed in the commentary to U.S.S.G. § 2B1.1, and courts have held that " '[t]he interpretation of "loss" under § 2B1.1 of the Guidelines is a question of law.' " *Id.* (citation omitted). We conclude that Brown's challenge is a legal one—he essentially disputes whether the term "loss" can include the situation here, where financially eligible people received government benefits in lieu of other financially eligible people—and we therefore conduct a *de novo* review.

■ Guideline 2F1.1, relating to fraud and deceit, treats amount of loss as a specific offense characteristic; loss of more than $500,000 but less than $800,000, as in Brown's case, results in a 10–level increase. U.S.S.G. § 2F1.1(b)(1)(K). Application note 7 provides that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." *Id.* § 2F1.1, comment. (n.7). We discussed this provision in *United States v. Watkins,* 994 F.2d 1192 (6th Cir.1993):

[T]hree factors must be present for an amount of loss to be relevant under section 2F1.1. First, as application note 7 instructs, the defendant must have intended the loss. Second, it must have been possible for the defendant to cause the loss. Third, the defendant must have completed or been about to complete but for interruption, all of the acts necessary to bring about the loss.

*Id.* at 1196.

We note, further, that note 7 to section 2F1.1 specifies that "[i]n a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." U.S.S.G. § 2F1.1, comment. (n.7(d)). Reading this commentary in conjunction with *Watkins,* we conclude that the district court correctly calculated the amount of loss for which Brown was responsible. By improperly issuing the certificates and vouchers, Brown diverted or attempted to divert funds from the recipients contemplated by the applicable regulations; as the district court observed, it is irrelevant that the actual recipients were financially eligible, given the fact that they were certainly not "next in line" for benefits. There was, therefore, an actual diversion of funds in the amount of $152,960.61. In some instances, of course, the funds were not *actually* diverted because the HUD investigation prevented the redemption of the already-issued certificates and vouchers. But clearly Brown intended for the certificates and vouchers to be used, and thus intended the diversion of funds, that is, the loss; just as clearly, the loss was possible, and would in fact have occurred but for HUD; and just as clearly, Brown did all he needed to do to bring about the loss. Had all the people to whom Brown wrongly issued certificates and vouchers actually redeemed those certificates and vouchers, the actual loss—again, meaning the funds diverted from the rightful recipients of benefits—would have been $358,063 greater than it was. The fact that the redemptions did not actually occur was attributable solely

to HUD's investigation, and it is not a circumstance which should redound to Brown's benefit. Therefore, Brown was correctly held responsible for a total loss of $511,023.61.

## III.

We **AFFIRM** the judgment of conviction and sentence of Brown, but **REVERSE** the judgment of conviction of Meadows.

GILMAN, Circuit Judge, concurring in part and dissenting in part.

Although I fully concur with the majority's well-reasoned disposition of the issues relating to Brown's conviction and sentence, I cannot agree with its dismissal of Meadows's conviction for aiding and abetting, and for conspiracy. I dissent in this regard for two reasons: (1) there was more than sufficient evidence presented at trial for any rational factfinder to conclude beyond a reasonable doubt that Meadows knew that the waiting list was a necessary requirement for obtaining Section 8 public housing, and (2) Meadows waived any challenge to her conspiracy conviction by not mentioning, much less arguing, the issue in her appellate brief.

### Sufficiency of the Evidence

The majority claims that none of the evidence the government produced at trial demonstrated that Meadows "had any understanding of the waiting list's function or purpose or proper use." I respectfully disagree. The evidence presented at trial and the inferences reasonably drawn therefrom were more than sufficient for a rational factfinder to conclude that Meadows knew that the waiting list was a requirement for obtaining Section 8 housing. Such evidence can be summarized as follows:

Meadows worked as one of four "housing eligibility investigators" in the Detroit Section 8 office. Her job duties included certifying tenants as being eligible to participate in the Section 8 program. Meadows was thus intimately involved in the process of moving people into Section 8 public housing. Ms. Walsh, a housing management specialist for HUD who monitored and provided training to the Detroit office, testified that she discussed the waiting list with members of the Detroit Section 8 staff "at least a dozen times." One of these staff members testified that the use of the waiting list was common knowledge in the office.

As part of her job duties as a housing eligibility investigator, Meadows would from time to time answer calls at the front lobby switchboard. A copy of the actual waiting list was kept nearby as a ready reference for those who manned the switchboard. Numerous telephone calls were received every day from individuals who were either on the waiting list and wanted to know where they stood on the list, or who were not on the waiting list and wanted to know if it was going to open up soon. Staff members manning the switchboard, including Meadows, would respond to these calls by looking to see where the person's name was on the waiting list, or by telling them that the list was closed if their name was not on the list. Unless one were to assume that the staff members were engaging in a completely useless or pointless enterprise, the most reasonable inference to draw from this activity is that only those at the top of the waiting list were in line to receive Section 8 housing. Reenforcing this assessment of the realities in the Section 8 office was the fact that a sign was placed prominently on the front door stating that the waiting list was closed. Indeed, for the period of time that Meadows worked at the Section 8 office, HUD had placed a freeze on anyone new being placed on the list.

From all of this evidence concerning the day-to-day activities in the Section 8 office, it would seem obvious to anyone working there that the waiting list was a key component in obtaining Section 8 housing. What else would explain all the telephone calls from the public inquiring about the waiting list, or the need to inform the public that the list was closed? Surely people would not make inquiries on a daily basis concerning something that was unimportant or irrelevant to obtaining Section 8 public housing.

To the majority, however, the above-mentioned evidence only indicates that Meadows was aware of the existence of the waiting list; not that being on the list was a legal precon-

dition to obtaining Section 8 public housing. Such a waiting list, however, does not exist in a vacuum. It has an obvious, commonly understood purpose of serving as a fair "first come-first served" method of gaining access to public housing. There is no indication that Meadows was mentally impaired or was so lacking in common sense that she was incapable of making this obvious connection.

Based on all the above, I believe it is naive to conclude that Meadows did not fully understand that the waiting list was a requirement to receive Section 8 housing. Indeed, Meadows herself noted that her prior boss, Mr. Bush, offered public housing "giveaways" for friends and family of employees at the Section 8 housing office. Far from indicating that the waiting list was not a requirement, this evidence shows that the various members of the Section 8 office devised methods of getting around the requirement. If Meadows did not know that the waiting list was a requirement to receive public housing, then why would Mr. Bush arrange such "giveaways" as a bonus for the Detroit staff?

As an alternative basis for reversing Meadows's convictions on Counts 47–50, the majority argues that the government introduced no evidence indicating that Meadows "played any sort of active role" in "aiding and abetting the *filing* of the documents." Again I respectfully disagree. Despite the fact that the law requires a person to be on the waiting list in order to obtain Section 8 housing, Meadows was able to induce Brown to provide such housing for her children, her mother, her brother, and her sister, even though none of them had ever been on the waiting list. In addition, Meadows also helped a number of her friends and acquaintances get into contact with Brown, which eventually led to them receiving Section 8 public housing despite having never been on the waiting list. For example, Meadows's hairdresser, Kit Martin, testified that he asked Meadows to help his wife's nieces get into Section 8 housing. Meadows replied that she could not guarantee that the nieces could get in because of the waiting list, but that she would talk to Brown about it.

On a number of occasions, Meadows served as a courier for the documents and forms her friends and family needed to get into public housing. Evidence was introduced that on at least one occasion a friend of Meadows got into Section 8 housing after a joint meeting with Meadows and Brown. A week later, Meadows brought application papers to the friend and then returned the completed forms to the Section 8 office. Within a few weeks, the friend was placed in public housing. In addition, Meadows brought to her mother the forms she needed to obtain Section 8 public housing. Although the persons Brown assisted in his "public-housing-for-money" scheme paid substantial sums for his help, Meadows's relatives and friends were never required to make such payments. The reason for this notable difference is that Meadows had a "personal relationship" with Brown.

The majority believes that none of this evidence indicates that Meadows "did any act to bring the § 1001 offenses about." In order to be guilty of aiding and abetting, however, an individual need only engage in acts designed to facilitate the commission of the unlawful act. *United States v. Evans,* 883 F.2d 496, 501 (6th Cir.1989). The government is not required to prove that Meadows actually filled out or submitted the false documents to HUD. *Cf. United States v. Winston,* 687 F.2d 832, 834–35 (6th Cir.1982) ("it is not necessary that appellant actually touched or possessed the cocaine."). By arranging meetings between Brown and her friends and family, by physically carrying the necessary forms and documents for her friends and family to fill out, and by using her "personal relationship" with Brown to assure the processing of the Section 8 applications, Meadows facilitated in the filing of false documents with HUD.

Given that there was more than sufficient evidence to demonstrate that Meadows knew that the waiting list was a requirement to gain Section 8 public housing, and that she aided and abetted Brown in filing false documents, I would affirm Meadows's conviction on counts 47–50. *See United States v. Charles,* 138 F.3d 257, 265 (6th Cir.1998) (holding that the jury's verdict should be

upheld when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

### Procedural Waiver

The other issue on which I differ with the majority is its handling of Meadows's conspiracy conviction under Count 46. While noting the belatedness of Meadows's request at the conclusion of oral argument for her conspiracy conviction to be reversed, the majority nonetheless reverses the conviction. Rather than granting Meadows's request, I firmly believe that the majority should instead have refrained from even considering the issue because of Meadows's failure to challenge her conspiracy conviction in her appellate brief.

Rule 28(a)(6) of the Federal Rules of Appellate Procedure requires that a party's brief contain "the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." Commenting on this rule, the Third Circuit in *United States v. Voigt,* 89 F.3d 1050 (3d Cir.1996), deemed the defendant to have waived any issue that was raised for the first time at oral argument because "consideration of that [argument] would vitiate the requirement of the Federal Rules of Appellate Procedure." *Id.* at 1064 n. 4; *see also United States v. Still,* 102 F.3d 118, 122 n. 7 (5th Cir.1996) (declining to address defendant's challenge to all six counts on which he was convicted because "[a]n appellant abandons all issues not raised and argued in its *initial* brief on appeal."); *United States v. Alonso,* 48 F.3d 1536, 1544–45 (9th Cir.1995) (declining to reach the merits of the defendant's sufficiency of the evidence argument because his brief failed to comply with the requirements of Rule 28); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Meadows's brief never made, much less hinted at, any challenge to her conviction on Count 46 for conspiracy. Instead, Meadows's brief does not go beyond requesting that "this Honorable Court ... vacate her conviction on Counts 47–50." The provisions of Rule 28 are not simply a technical nicety; they have a direct impact on the functioning of the adversary system. The government in this case, for example, never had an opportunity either in its appellate brief or at oral argument to respond to Meadows's request to reverse her conspiracy conviction.

The majority's insistence on using the last minute plea of Meadows's counsel to reverse her conspiracy conviction is not only unwarranted (because the evidence is more than sufficient to support the conviction), but is also bad precedent (because it disregards Rule 28(a)(6) of the Federal Rules of Appellate Procedure). Needless to say, I believe that the majority's invocation of FED. R.APP. P. 2 to override Rule 28 is unjustified in light of my conclusion that the evidence was more than sufficient to sustain Meadows's conviction by the jury. Furthermore, the discretion provided for in Rule 2 should only be exercised "in the absence of a showing of prejudice to the appellee." *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 66, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (Marshall, J., dissenting); *see also United States v. Baker,* 999 F.2d 412, 417 (9th Cir.1993) (recognizing that application of Rule 2 is prohibited where the government has suffered prejudice from the defendant's failure to raise the issue on appeal). Noticeably absent from the majority's invocation of Rule 2 is any discussion of prejudice to the government. The prejudice caused by the summary reversal of Meadows's conspiracy conviction without providing the government an opportunity to respond should be readily apparent.

For all the above reasons, I would hold that Meadows has waived her right to challenge her conviction for conspiracy under Count 46.