# PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ROBERT B. MILLER,
          *Defendant-Appellant.*

No. 02-4078

Appeal from the United States District Court
for the Southern District of West Virginia, at Bluefield.
David A. Faber, Chief District Judge.
(CR-00-38)

Argued: October 31, 2002

Decided: January 14, 2003

Before WILKINSON, Chief Judge, and LUTTIG and
MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Chief Judge Wilkinson and Judge Luttig joined.

## COUNSEL

**ARGUED:** Michael William Carey, CAREY, SCOTT & DOUG-
LAS, P.L.L.C., Charleston, West Virginia, for Appellant. Hunter P.
Smith, Jr., Assistant United States Attorney, Charleston, West Vir-
ginia, for Appellee. **ON BRIEF:** Kasey Warner, United States Attor-
ney, Charleston, West Virginia, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Dr. Robert Miller pled guilty to mail fraud for over-billing third-party insurers for services rendered in his medical practice. On appeal, Miller argues that, when sentencing him, the district court miscalculated the amount of loss resulting from this fraud. Finding no reversible error in the district court's loss calculation, we affirm.

I.

A grand jury indicted Miller on twenty-two counts of mail fraud in violation of 18 U.S.C.A. § 1341 (West 2000). The indictment charged Miller with submitting false claims to Medicaid, Medicare, West Virginia's Workers' Compensation program, and other health insurance providers. Miller pled guilty to one count of mail fraud. The district court conditionally accepted Miller's plea pending receipt and review of a presentence investigation report (PSR).

In the PSR, the probation officer concluded that Miller defrauded Medicare, Medicaid, Workers' Compensation, and private insurers in four different ways. First, attempting to seek a higher reimbursement rate, Miller billed ordinary new patient visits as more expensive "consultations." Second, Miller routinely "upcoded" services performed during office visits, claiming reimbursement for a higher level of service than he actually provided. Third, Miller engaged in "phantom billing" — submitting claims for office visits, services, and equipment that he never provided. Finally, Miller used false diagnosis codes to claim reimbursement for services not covered by Medicare and Medicaid.

In preparing the PSR, the probation officer reviewed over 200 Medicare and Medicaid reports in an attempt to estimate the total loss resulting from Miller's fraudulent conduct. This review disclosed an error rate of 94% in Miller's Medicare billing and 85% in his Medicaid billing. This review also revealed that Miller's practice of upcoding could result in payment three times or more than legally authorized.

Additionally, the probation officer relied on the results of an investigation by several undercover law enforcement officers who made visits to Miller. In 23 out of the 24 visits made by the officers, Miller submitted fraudulent claims to the Government or private insurers. Finally, the officer noted in the PSR that Miller paid $1.3 million to settle the civil suit filed by the Government, $375,000 of which represented alleged overpayments by Medicare and Medicaid.

In summary, the PSR estimated that total losses to Medicare, Medicaid, Workers' Compensation, and private insurers exceeded $200,000. However, the PSR recommended that the district court adopt the more "conservative estimate" of $150,000 in losses, based only on losses to Medicare and Medicaid for fraudulent consultations. This figure did not include any losses to Workers' Compensation or private insurers, nor did it include losses to Medicare or Medicaid resulting from Miller's fraudulent practices of "upcoding," "phantom billing," or false diagnoses. Pursuant to *U.S. Sentencing Guidelines Manual* ("U.S.S.G.") § 2F1.1(b)(1)(H) (2000), which establishes an increase of seven offense levels if an offense involves more than $120,000 but less than $200,000, the PSR recommended an increase of seven offense levels based on the estimated loss of $150,000.

Miller filed objections to the PSR, disputing the loss calculation contained in the report. He also moved for a downward departure pursuant to U.S.S.G. § 5K2.0. In his written objection to the PSR, and orally at the sentencing hearing, Miller argued that the proper measure of loss for sentencing purposes was the difference between the amount he *actually received* from Medicare and Medicaid and the amount to which he was legitimately entitled for the services he rendered. Using this formula, and after comparing his patient records with Medicare and Medicaid billing information, a billing specialist hired by the defense estimated the proper loss amount to be between $22,440 and $38,955. According to Miller's calculations, the offense level based on the estimated loss should therefore have been increased by four levels, rather than the seven recommended in the PSR. *See* U.S.S.G. § 2F1.1(b)(1)(E).

At the sentencing hearing, the Government conceded that some of Miller's objections to the PSR were reasonable and that the defense expert's loss estimate was based on better data than the PSR. How-

ever, the Government argued that the proper formula for calculating loss was the difference between the amount Miller *billed* (rather than the amount he actually received) and the amount to which he was legitimately entitled. Under this formula, the Government computed losses of approximately $73,000, using Miller's own, most generous estimate of the amount of money to which he was entitled. Pursuant to U.S.S.G. § 2F1.1(b)(1)(G), the Government therefore recommended increasing the offense level by six levels based on estimated loss in the range of $70,000 to $120,000.

Relying on the findings in the PSR and the evidence presented by Miller and the Government at the sentencing hearing, the district court concluded that $100,000 would be a conservative estimate of the loss in this case. However, because the Government conceded at the sentencing hearing that it had only established loss in an amount ranging from $73,000 to $76,000, the court held that the total loss amount was between $73,000 and $76,000 and accordingly increased Miller's offense level by six levels. *See* U.S.S.G. § 2F1.1(b)(1)(G). The court also denied Miller's motion for a downward departure.

## II.

The Sentencing Guidelines direct courts to increase the offense level for defendants convicted of fraud commensurate with the amount of loss involved in the fraud. *See* U.S.S.G. § 2F1.1(b)(1). Miller challenges the district court's interpretation of "loss" under the Sentencing Guidelines on two grounds. First, he contends that the district court erred in interpreting the term "loss" under the Guidelines to encompass intended, rather than actual, loss. Second, he argues that even if the district court correctly used intended loss in its calculations, the Guidelines limit intended loss to the amount of loss that was likely, or possible, and the loss calculated by the district court was not likely.

We consider each of these arguments in turn, reviewing the district court's interpretation of the term "loss" under the Sentencing Guidelines *de novo*. *See United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir. 2000); *United States v. Parsons*, 109 F.3d 1002, 1004 (4th Cir. 1997).

A.

Miller argues initially that precedent and the commentary to the Sentencing Guidelines require, in cases like his, that courts use the actual, rather than the intended, amount obtained through fraud to compute loss for sentencing purposes. He maintains that the district court erred, therefore, in using the amount he *intended* to obtain to compute the loss attributable to his fraud. In support of this proposition, Miller cites language from *Dawkins*, *Parsons*, and U.S.S.G. § 2F1.1, application note 8(d). Miller misreads our precedent and note 8(d).

1.

Neither *Parsons* nor *Dawkins* addresses the actual rather than intended loss question. Moreover, other circuit precedent makes clear that a court may use intended, rather than just actual, loss in calculating the loss attributable to fraud for sentencing purposes.

*Parsons*, 109 F.3d at 1003, involved an employee of the United States Postal Service convicted of mail fraud for submitting false travel vouchers for cash advances or reimbursement. The vouchers sought reimbursement for some nonexistent expenses, but also sought reimbursement for some expenses legitimately incurred in the course of business. *Id.* At sentencing, the district court held that the amount of loss was the total amount claimed on the false vouchers. *Id.* We vacated that determination because the district court had failed to subtract legitimate expenses from the total amount of loss. *Id.* We explained that "[l]oss is not the total amount of the benefits the defendant received, because some benefits may be rightfully due; instead, loss is measured by the amount diverted from proper purposes." *Id.* at 1004.

In *Dawkins*, 202 F.3d at 712, a jury convicted another postal worker of making false statements to obtain federal employee's compensation benefits. The district court found that the postal worker's false statements had disentitled him to any compensation benefits, and that the loss, therefore, was the entire amount of benefits Dawkins received as a result of his false statements. *Id.* at 714. We vacated, holding that *Parsons* dictated that loss be calculated as "the difference

between the amount of benefits Dawkins actually received and the amount he would have received had he truthfully and accurately completed the [benefits] forms." *Id.* at 715 (citing *Parsons*, 109 F.3d at 1004-05).

In this case, Miller focuses on our use of the phrase "benefits . . . actually received" in *Dawkins*, *id.*, and similar language in *Parsons*, 109 F.3d at 1004 ("tangible economic loss of the victim"), to argue that the district court erred in using the loss he intended in calculating the fraud loss amount. However, neither *Parsons* nor *Dawkins* involved intended, but unrealized, losses. Unlike Miller, both Parsons and Dawkins actually received the full amount of money that they fraudulently claimed. Thus, *Parsons* and *Dawkins* simply hold that when determining losses for sentencing purposes, a court must subtract the amount of money or benefits to which a defendant is legitimately entitled from the amount fraudulently claimed. In this case, therefore, the district court properly applied *Parsons* and *Dawkins* when it calculated the loss, subtracting the value of the services to which Miller was actually entitled (i.e., the value of the services he actually performed) from the amount that he billed.

Although neither *Parsons* nor *Dawkins* addresses the issue that Miller raises — whether "loss" under the Sentencing Guidelines includes intended loss, or merely actual loss — in other cases we have squarely endorsed the use of intended loss rather than just actual loss. In *United States v. Wells*, 163 F.3d 889 (4th Cir. 1998), for example, we considered a mail fraud conviction involving fraudulent financial instruments called "comptroller warrants." We upheld the district court's calculation of loss amount as including warrants in sealed envelopes that had never been mailed to the addressees, finding that the un-mailed warrants were properly included in the loss calculation as an "intended loss." *Id.* at 900-01; *see also United States v. Brothers Constr. Co.*, 219 F.3d 300, 318 (4th Cir. 2000) ("[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.") (quoting U.S.S.G. § 2Fl.1, cmt. n.[8]); *United States v. Loayza*, 107 F.3d 257, 266 (4th Cir. 1997) ("Where the 'intended loss' is greater than the 'actual loss,' the intended loss should be used."); *United States v. Williams*, 81 F.3d 1321, 1328 (4th Cir. 1996) ("Under the Guidelines, a fraud 'loss' for sentencing purposes includes not just actual loss but

intended loss whenever the latter can be determined."). Indeed, even *Parsons* recognizes that loss calculations may include, "actual, probable, or intended loss to the victims." 109 F.3d at 1004 (quoting *United States v. Marcus*, 82 F.3d 606, 608 (4th Cir. 1996)).

Accordingly, the relevant case law provides no support for Miller's argument that the Guidelines limit loss to actual, rather than intended, loss.

2.

Like the case law, application note 8 of U.S.S.G. § 2Fl.1, on which Miller also relies for his actual loss argument, offers him little assistance. The note generally provides that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, cmt. n.8.[1] Because the intended loss in Miller's case exceeded the actual loss, the note apparently requires use of the intended loss figure. Miller, however, argues that in cases involving losses to government programs like Medicare and Medicaid, note 8(d) modifies the general directive in note 8 to use intended loss whenever possible.

Note 8(d) states, "In a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." U.S.S.G. § 2F1.1, cmt. n.8(d). Miller maintains that this subsection instructs courts to use only actual losses to government programs, rather than intended losses. In essence, Miller asks us to read note 8(d) to mean: in a case involving diversion of public program benefits, loss is the value of the benefits *actually* diverted, rather than the value of the benefits *intended* to be diverted.

Assuming that the case at hand can properly be characterized as one "involving diversion of government program benefits," *id.*; *cf. United States v. Nastasi*, 2002 U.S. Dist. LEXIS 8765, at *8-11

---

[1] *Cf. Stinson v. United States*, 508 U.S. 36, 38 (1993) (holding that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

(E.D.N.Y. Apr. 17, 2002), Miller makes the same error in interpreting note 8(d), as he does in interpreting *Dawkins* and *Parsons*. Like those cases, note 8(d) simply does not speak to the issue of whether courts can use intended rather than actual loss, but instead deals with an issue altogether different from the one to which Miller would have it apply. Specifically, note 8(d) directs courts to include the diversion of government program benefits as losses, *even if the government funds ultimately go to eligible recipients*. In other words, in cases involving government program benefits, loss is the value of the benefits *diverted*, as opposed to merely the value of benefits that ultimately end up in the hands of ineligible recipients, or are used for an unauthorized purpose.

A sampling of cases applying note 8(d) illustrates this point. For example, in *Brothers*, 219 F.3d at 304, we considered a fraud involving the distribution of federal highway funds. Federal regulations require contractors, like the defendants in *Brothers*, to comply with state programs fostering the development of "disadvantaged business enterprises" ("DBEs"). *Id.* A jury convicted the Brothers Construction Company of fraudulently representing that work done by a non-DBE had been done by a DBE. *Id.* The Government uncovered this fraud before the completion of the project, however, and the contractors were able to change their sub-contracting arrangements, and ultimately satisfy the DBE requirements. *Id.* at 317-18.

Relying on the same application note that Miller cites,[2] the contractors argued that no loss could be attributed to their conduct because the DBE requirements had ultimately been satisfied, and at no additional cost to the Government. *Id.* Thus, they maintained that no government funds had actually been diverted from their intended recipients because the federal highway funds ultimately ended up in the hands of a contractor that satisfied the DBE requirements. *Id.* We rejected this argument, holding that the contractors' intention to divert the funds to a non-DBE was sufficient to establish a loss under the U.S.S.G. § 2F1.1. *Id.* at 318 ("If an intended loss that the defendant

---

[2]The numbering of the comments in earlier versions of the Sentencing Guidelines differs from the numbering of the comments in the 2000 Sentencing Guidelines which govern this case. The text of the notes discussed, however, is identical.

was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.") (quoting U.S.S.G. § 2F1.1, cmt. n.[8]).

Similarly, in *United States v. Brown*, 151 F.3d 476 (6th Cir. 1998), the Sixth Circuit relied on the same note to reject Brown's argument that because his conduct had not resulted in any money being "unlawfully taken," no "loss" had occurred. *Id.* at 489. Federal law required Brown, an administrator of a Section 8 housing program, to place applicants for benefits on a waiting list, and then select persons from that waiting list in a particular order. *Id.* at 479. However, Brown chose certain individuals out of order in exchange for bribes and other consideration. *Id.* at 480. On appeal, Brown argued that the United States Department of Housing and Urban Development had suffered no loss as a result of his conduct because all persons selected for Section 8 benefits were, in fact, qualified to receive those benefits. *Id.* at 489. The Sixth Circuit rejected this argument, holding that by choosing persons out of order, "Brown diverted or attempted to divert funds from the recipients contemplated by the application regulations." *Id.*; *see also United States v. Kosth*, 257 F.3d 712, 722 (7th Cir. 2001); *United States v. Hayes*, 242 F.3d 114, 120 n.4 (3d Cir. 2001).

Thus, these cases make clear that note 8(d) is not meant to distinguish actual loss of government program benefits from intended loss of government program benefits, as Miller would have us read it. Rather, note 8(d) clarifies that "loss" includes the amount of government program benefits diverted from intended recipients or uses, even if those funds are ultimately distributed to eligible recipients, or used for an otherwise authorized purpose. Indeed, as in both *Brothers* and *Brown*, when note 8(d) is read in conjunction with the general directive relating to intended losses, § 2F1.1 extends to situations in which there may be *no actual* loss to the Government because the diverted funds went to otherwise lawful recipients.

In sum, the district court did not err in interpreting "loss" under the Sentencing Guidelines to encompass intended loss. Accordingly, we reject Miller's first argument.

## B.

Alternatively, Miller contends that even if the district court properly interpreted "loss" to include "intended" loss, the Guidelines limit

"intended" loss to that which is likely or possible. Therefore, Miller insists, the court erred in using the amount he billed to Medicare and Medicaid, rather than the payments those programs allow, in estimating the amount of loss he intended because he "could not have any reasonable expectation to be paid any monies beyond what the programs allow." Brief of Appellant at 23.

As an initial matter, we note that this argument finds some support in case law from the Sixth and Tenth Circuits. For example, in *United States v. Santiago*, 977 F.2d 517, 524 (10th Cir. 1992), the Tenth Circuit ruled that a defendant's subjective intent should not control "when the economic reality is that the probable or actual loss could not in any circumstances have exceeded a discernible lesser amount." Applying this reasoning, the court held that the maximum loss in an automobile insurance fraud case was the $4,800 "blue book" value of the car, not the full $11,000 amount submitted to the insurance company by the defendant. *Id.* at 525-26; *see also United States v. Galbraith*, 20 F.3d 1054, 1059 (10th Cir. 1994). The Sixth Circuit has adopted a similar view, stating that "the intended loss must have been possible to be deemed relevant." *United States v. Watkins*, 994 F.2d 1192, 1196 (6th Cir. 1993).

The majority of circuits in more recent cases, however, have rejected this "economic reality" approach, holding that the Guidelines permit courts to find intended loss in an amount exceeding that which was in fact possible or probable. *See, e.g.*, *United States v. Edwards*, 303 F.3d 606, 645 n.27 (5th Cir. 2002) ("[N]othing in § 2F1.1 n.[8] requires that the defendant be capable of inflicting the loss he intends."); *United States v. Klisser*, 190 F.3d 34, 35 (2d Cir. 1999) (*per curiam*) (rejecting view taken in *Galbraith*); *United States v. Blitz*, 151 F.3d 1002, 1010 (9th Cir. 1998) ("The fact that, due to conditions beyond their control, the seed that defendants had so hopefully sowed could never grow into a harvest crop has not affected our determination of the intended loss itself."); *United States v. Studevent*, 116 F.3d 1559, 1563 (D.C. Cir. 1997) ("[I]ntended loss under application note [8] to Guidelines section 2F1.1 is not limited to an amount that was possible or likely."); *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997) ("It is not required that an intended loss be realistically possible."); *United States v. Coffman*, 94 F.3d 330, 336 (7th Cir. 1996) (rejecting the argument "that a loss that cannot possi-

bly occur cannot be intended," and concluding that "the unlikelihood of an actual loss does not affect the computation of the 'intended loss.'").

We adopt the majority view, and hold as a matter of law that the Guidelines permit courts to use intended loss in calculating a defendant's sentence, even if this exceeds the amount of loss actually possible, or likely to occur, as a result of the defendant's conduct. We find the majority view more persuasive for several reasons.

First, that approach better accords with the text of note 8. The note instructs: "Consistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, cmt. n.8. As the D.C. Circuit has observed, this note "does not qualify 'intended loss' in any way." *Studevent*, 116 F.3d at 1562. The plain language of the note indicates that the Commission regarded a defendant's intent as the focal point of the guideline. Thus, neither the Guideline nor its commentary contains any requirement that this intent be realistic. *See United States v. Robinson*, 94 F.3d 1325, 1328 (9th Cir. 1996) ("There is nothing in note [8] that mandates that the defendant be capable of inflicting the loss he intends."); *Coffman*, 94 F.3d at 336 (noting that 'economic reality' approach "gives a twisted meaning to the word 'intended'").

Application note 11 to § 2F1.1 further counsels against reading "intended loss" as limited to what is realistic or possible. Application note 11 authorizes a downward departure "where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it." U.S.S.G. § 2F1.1, cmt. n.11. "It would be unnecessary to authorize such a departure if the unlikelihood of success already limited the intended loss attributable to a defendant under application note [8]." *Studevent*, 116 F.3d at 1563; *see also United States v. Geevers*, 226 F.3d 186, 196 (3d Cir. 2000) ("In light of the specific contemplation of impossibility in the context of departures, grafting an impossibility exception on to the setting of the offense level is inconsistent with the language and structure of the guidelines."); *Coffman*, 94 F.3d at 336 (concluding that the

argument "that a loss that cannot possibly occur cannot be intended . . . is inconsistent with application note [11]").[3]

Furthermore, the majority view is more consistent with an important principle underlying the Guidelines, namely matching punishment with culpability. *See* U.S.S.G. ch. 1, pt. A(3) ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."). As one of our sister circuits has noted, "[l]imiting intended loss to that which was likely or possible . . . would eliminate the distinction between a defendant whose only ambition was to make some pocket change and one who plotted a million-dollar fraud." *Studevent*, 116 F.3d at 1563; *see also Coffman*, 94 F.3d at 336 (noting that the 'economic reality' approach "would, if accepted, irrationally erase any distinction in the severity of punishment between a defendant who tries to defraud his victim of $1,000 and a defendant who tries to defraud his victim of $1,000,000").

Finally, although mindful of the pitfalls of using subsequent amendments to interpret prior legislation, we note that the Sentencing Commission has recently agreed that the majority interpretation of § 2F1.1 best conforms with the objectives of the Guidelines, and amended the definition of loss to clarify this point. *See* U.S.S.G. supp. to app. C at 185 (2001) ("The amendment resolves the [circuit] conflict to provide that intended loss includes unlikely or impossible losses that are intended, because their inclusion better reflects the cul-

---

[3]One observer has also suggested that the "economic reality" approach adopted by the Sixth and Tenth Circuits, and recommended to us by Miller, flies in the face of broader legal principles. *See* Frank O. Bowman, "Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History," 35 Ind. L. Rev. 5, 79 (2001) ("The Tenth Circuit was apparently attempting to import into fraud sentencing a version of the principles of criminal liability concerning mistake of fact, or perhaps the doctrine of impossible attempts. Even if those principles have a place in sentencing law, the Tenth Circuit does not appear to have applied them properly to the facts of *Santiago*."); *id.* at 79-80 ("The Tenth Circuit's *Galbraith* opinion creates the arguably anomalous situation that a defendant can be sentenced based on the amount of nonexistent narcotics he attempted to buy from a government agent, but not on the amount of money he attempted to swindle from the same agent.").

pability of the offender."). The commentary to the new guideline states that intended loss, "(I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g. as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1, cmt. n.2(A)(ii) (2001).[4]

Thus, we adopt the position taken by the majority of circuits, and hold that "intended loss" under U.S.S.G. § 2F1.1 (2000) is not limited by the amount of loss that is actually possible or likely to occur as a result of a defendant's conduct. For this reason, we reject Miller's second legal argument.

### III.

Finally, Miller maintains that the district court erred in estimating the amount of the loss he intended. Specifically, Miller contends that the court should not have calculated the amount of loss he intended on the basis of the amount Miller *billed* to Medicare and Medicaid.

We review for clear error the district court's factual determination of the amount of loss Miller intended. *Dawkins*, 202 F.3d at 714; *Parsons*, 109 F.3d at 1004. In doing so, we recognize that "only a preponderance of the evidence need support these factual findings." *Loayza*, 107 F.3d at 265. Moreover, "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, cmt. n.9.

The Third Circuit recently considered an argument very similar to Miller's in *Geevers*, 226 F.3d at 193. In that case, the defendant, convicted of bank fraud, contended that the district court erred in finding that the relevant loss amount caused by his fraud was the total face value of his fraudulent checks because "he could not have successfully withdrawn those funds even if he had wanted to." *Id.* at 189. The court of appeals rejected this argument, reasoning that a sentencing court may "draw inferences from the face value of . . . checks

---

[4]Amendment 617 to the Sentencing Guidelines consolidated § 2F1.1 with § 2B1.1. *See* U.S.S.G. supp. to app. c amend. 617.

[$2,000,000] in arriving at the factual conclusion that the defendant intended" losses in the face value amount, even though he only withdrew $400,000. *Id.* at 193. Indeed, the court held that the prosecution's introduction of evidence regarding the face value of the defendant's fraudulent checks constituted a "prima facie case" of intended loss. *Id.*; *see also United States v. Kushner*, 305 F.3d 194, 197-98 (3d Cir. 2002); *United States v. Hayes*, 242 F.3d 114, 118 (3d Cir. 2001). So it is in this case — the district court did not clearly err in relying on the amount Miller billed Medicare and Medicaid as prima facie evidence of the amount of loss he intended to cause.

The justification for this rule is clear. As anyone who has received a bill well knows, the presumptive purpose of a bill is to notify the recipient of the amount to be paid. Indeed, courts have recognized this principle for well over a hundred years. *See, e.g.*, *First Nat'l Bank v. Henry*, 159 Ala. 367, 378 (1905) ("The loss is prima facie the amount of the bill or note."); *First Nat'l Bank v. Fourth Nat'l Bank*, 77 N.Y. 320, 328 (1879) (same); *see generally* Restatement (Second) of Torts § 911 cmt. g (1979) ("Prima facie the present worth of a chose in action calling for an unconditional payment of a sum of money is the amount of the obligation."); 18 Am. Jur. 2d *Conversion* § 136 (2002) ("[W]here the instrument calls for the payment of money the owner is presumed to be damaged to the extent of its face value, which, prima facie, is its actual value.").

Of course, the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent. In the instant case, however, as in *Geevers*, 226 F.3d at 194, the defendant offered no evidence to rebut the Government's prima facie case.

Miller's counsel did argue at sentencing that Miller intended to bill Medicare and Medicaid only the amount set forth on the government-established "fee schedule" as the price of a given medical service. *See, e.g.*, 42 U.S.C. § 1395w-4(a)(1) (West Supp. 2002) (providing that doctors billing Medicare will only receive the lesser of either the numerical price they include on the bill or "the amount determined under the fee schedule" for the procedure they perform and thus guaranteeing that such providers will not receive more from such pro-

grams than the fixed price associated with the procedure they report on the reimbursement form). If Miller had offered evidence on this point (and similar evidence as to the other insurers he defrauded), he might well have overcome the usual presumption that a "bill is a bill." But Miller offered no such evidence. He did not testify that he was aware of the Medicare or Medicaid fee schedules; nor did he proffer any evidence to suggest that he knew the amount Medicare and Medicaid would pay; nor did he proffer any evidence that he was aware of which patients were covered by Medicare or Medicaid — and therefore subject to the fee schedules for these programs — rather than by Workers' Compensation or private insurers.

At oral argument, Miller's counsel stated that "it would be fancy to speculate that [Miller] did not know that he was not getting the full amount [billed]." This statement misapprehends the standard under which we review the district court's factual findings and ignores the common inference that the amount billed is the amount that is intended to be paid. In essence, Miller asks us to assume that he knew the limits on Medicare and Medicaid payments — although he never testified to this fact — and that he chose to bill well above that amount with no intention of receiving the amount billed — although he never testified to this fact, much less suggested any alternative reason for the billing amount.

Even if we were to assume, as Miller contends, that he did not have any "reasonable expectation" of receiving the full amount billed, this would not render the district court's estimate clearly erroneous. "[E]xpectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can." *Geevers*, 226 F.3d at 193. While Miller, like the defendant in *Geevers*, "may not have expected to get it all, he could be presumed to have wanted to." *Id.* In such situations, a sentencing court may rely on the prosecution's prima facie showing as "sufficient evidence" that the face amount "was the intended loss." *Id.* at 194.

Finally, Miller's argument ignores the fact that during the course of his criminal activity, he defrauded Workers' Compensation and private insurers, as well as the Medicare and Medicaid programs.[5]

---

[5]The district court did not include the loss to Workers' Compensation and private insurers in its estimate because these losses were too difficult

Here, again, Miller offers no evidence to suggest that he made distinctions in billing between patients covered by Medicare and Medicaid and patients covered by Workers' Compensation or private insurers. Indeed, the results of the presentence investigation suggest the contrary; it appears Miller engaged in similarly fraudulent billing practices regardless of the insurer. Miller does not argue that Workers' Compensation and private insurers place the same limits on payment as Medicare and Medicaid, and thus it would surely be reasonable for a court to conclude that Miller intended to receive the full amount billed to these insurers. Absent any evidence that Miller was aware of which patients were covered by Medicare and Medicaid, and which patients were covered by Workers' Compensation or private insurance, it was not clearly erroneous for the district court to find that Miller intended losses in the amount he billed patients, irrespective of their insurance coverage. In fact, it seems clear that the district court properly followed the Sentencing Guidelines and made "a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, cmt. n.9.

Because Miller has failed to demonstrate that the district court's factual determination that he intended loss in the amount billed to Medicare and Medicaid constituted clear error, we affirm the district court's determination of loss for sentencing purposes.[6]

---

to determine accurately. Similarly, the court ignored losses resulting from Miller's fraudulent practice of "upcoding," "phantom billing," and submitting false diagnoses. However, the presentence investigation and Miller's $1.3 million settlement suggest that these losses were substantial.

[6]Miller also contends that the district court erred in denying his motion for a downward departure because the court relied on a material mistake of fact, i.e., that his guideline sentence range falls within Zone D, making him ineligible for probation or a split sentence. Miller argues that this was a clear error because in determining his guideline sentence range, the court used a loss figure of between $73,000 and $76,000, rather than the $22,000 to $35,000 figure Miller proposes. Given our conclusion that the district court's determination of the loss involved in this case was not clearly erroneous, Miller's argument concerning the denial of his motion for downward departure must fail.

## IV.

In sum, the district court correctly interpreted "loss" under the Sentencing Guidelines and did not clearly err in it factual findings as to the amount of loss in this case.

*AFFIRMED*