**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-4612**

_____

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

DONALD BOOKER,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Kenneth D. Bell, District Judge.  (3:22−cr−00034−KDB−SCR−1)

_____

Argued:  March 4, 2025                                    Decided:  July 22, 2025

_____

Before DIAZ, Chief Judge, and AGEE and BENJAMIN, Circuit Judges.

_____

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Agee and Judge Benjamin joined.

_____

**ARGUED:**  William David Auman, AUMAN LAW OFFICES, Asheville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

DIAZ, Chief Judge:

Donald Booker owned and operated United Youth Care Services, which billed North Carolina's Medicaid program for millions of dollars' worth of medically unnecessary drug tests. He appeals his conviction on ten counts arising from this scheme. Finding no error, we affirm.

## I.

## A.

Medicaid is a state-administered health insurance program for low-income Americans.[1] The program pays for medically necessary services, including drug testing connected to substance abuse treatment.

Booker ran United Youth Care Services, a company that offered substance-abuse treatment programs, and United Diagnostic Laboratories, a separate but related entity that provided drug testing services for United Youth.[2] As explained below, United Youth worked with partner organizations to recruit individuals to submit to drug testing for which the company could bill Medicaid.

The company used several medical providers to certify that the testing was medically necessary, even though those providers usually didn't meet with the beneficiary.

---

[1] Since the government prevailed at trial, we recount the facts in the light most favorable to it. *United States v. Torrez*, 869 F.3d 291, 295 (4th Cir. 2017).

[2] The two entities, while technically distinct, were largely treated in practice and at trial as interchangeable, and we do the same.

2

Angela Johnson, a nurse practitioner, testified that she attested to medical necessity on several patient forms, even though she generally didn't see the patient or make an individualized determination of necessity.[3]

Booker set the protocols for the drug testing scheme. His right-hand man at the company, Richard Graves, testified that Booker directed testing of all participants in the company's programs twice per week, regardless of individual medical need. These tests used the same testing panel (meaning samples were tested for the same set of drugs), regardless of a beneficiary's personal clinical needs. Graves also testified that Booker was part of the group that decided which tests to run on beneficiaries.

### B.

To recruit Medicaid beneficiaries for the fraudulent enterprise, Booker turned to two other entities. The first, "Do It 4 the Hood," was a counseling and mentoring program for at-risk youth.

Booker arranged for United Youth and Do It 4 the Hood to team up on a "drug-free program for the kids" that would involve "drug test[ing them] to make sure they weren't using drugs" and "do[ing] activities with them on the weekend." J.A. 288. Do It 4 the Hood targeted Medicaid beneficiaries and "check[ed] the Medicaid [rolls] before a person was admitted to the program." J.A. 682. The organization required all individuals to

---

[3] Johnson was supervised by Dr. Anita Jackson. Dr. Jackson maintained a medical practice in Lumberton, Rockingham, and Raleigh, North Carolina. From this, we gather that Jackson is the same doctor whose fraud conviction under the Food, Drug, and Cosmetics Act in an unrelated scheme was recently affirmed. *United States v. Jackson*, 126 F.4th 847, 852 (4th Cir. 2025).

3

submit to drug testing to participate in its program whether or not they used drugs. In fact, a "great number" of the program participants weren't drug users. J.A. 343.

Do It 4 the Hood collected urine samples, while United Youth ran drug tests on the samples and billed Medicaid for the tests. After Medicaid paid United Youth, the company would in turn pay Do It 4 the Hood "a kickback" for the samples Do It 4 the Hood collected.

The two entities agreed on paper that Do It 4 the Hood would be paid $30 per hour "for every hour of services rendered," but this hourly rate was a façade. J.A. 337. In truth, United Youth paid Do It 4 the Hood $30 per urine sample collected.[4] A Do It 4 the Hood representative manufactured invoices showing the number of hours the entity purportedly worked, which matched the number of urine samples it collected. He did so "to legitimize" the scheme. J.A. 365.

Do It 4 the Hood's owners "deal[t] with" both Booker and Graves. J.A. 297. Graves generally handled billing and invoices. But Graves "would let Mr. Booker know" about Do It 4 the Hood's "numbers on a weekly basis" so that Booker "would know . . . the amount of money . . . to be paid for the kickback." J.A. 683–84, 688. Booker was "responsible for ensuring that Do It 4 the Hood would get paid." J.A. 683. All told, United Youth paid Do It 4 the Hood about $124,000 in kickbacks. .

---

[4] While the two entities initially had a per-sample fee arrangement, they later agreed to "split" Medicaid fraud proceeds equally.

United Youth also sourced urine samples for drug testing from an entity called Legacy Housing, which operated "boarding houses for recovering addicts and alcoholics," J.A. 438, and primarily catered to homeless North Carolina Medicaid beneficiaries.

A mutual contact introduced Booker to Legacy Housing's owner, Delores Jordan. Legacy Housing operated a facility in Charlotte, North Carolina.  During Booker and Jordan's first meeting, Booker explained that drug testing Legacy Housing's tenants could improve safety in Legacy Housing–managed facilities.  Since Jordan didn't believe that her tenants "would just agree to be drug tested," Booker offered "to pay $10 a day per client for meals" in exchange for "[t]hem participating in the urine program."  J.A. 448.

Booker and Jordan eventually agreed to move Legacy Housing's operations to Greensboro, North Carolina, where Booker could obtain larger Medicaid reimbursements. Booker thereafter offered to "provide a rent subsidy" to Legacy Housing's tenants, who were required to agree to testing to live in the program's facilities.  J.A. 451.  He also agreed to pay Jordan $40 per Legacy Housing tenant per day.  Booker later agreed to pay Jordan "25 percent of all the [Medicaid] reimbursement" for each tenant.  J.A. 471.

Jordan dealt with Graves and Booker whenever there were "money issues."  J.A. 459.  In total, United Youth paid Jordan nearly $1.5 million in kickbacks.

Booker also personally benefitted from the Medicaid fraud scheme.  At trial, Booker testified on cross-examination that $1 million was debited from United Youth's bank account on the same day that Booker deposited $1 million into his personal bank account. On redirect, he testified that he had a $1.5 million line of credit with the bank.

5

C.

United Youth took steps to disguise the kickbacks. The kickback payments sometimes included misleading descriptions in the "memo" line on the checks. For example, on one check United Youth paid to Jordan, the memo line read "Sales rep." J.A. 940–41. On another, the memo line said "Marketing." J.A. 941.

In addition, United Youth structured kickback payments to avoid a $10,000 federal transaction reporting threshold. After a bank froze a check for an amount greater than $10,000, Booker "instructed" Graves "not to cut any checks over the amount of $10,000." J.A. 748. He later directed Graves to limit each check to $5,000.

D.

The managed-care organization that handled Medicaid services for parts of North Carolina (including Greensboro) suspected that United Youth was engaged in fraud and launched an investigation. The organization referred the investigation to the North Carolina Medicaid Investigations Division, which imposed sanctions, including revoking United Youth's license to operate.

United Youth appealed the sanctions to an administrative law judge. The judge found that United Youth exploited clients and provided benefits to Medicaid beneficiaries, beyond the ordinary provision of medical services, that were contingent on its ability to claim reimbursement from Medicaid. In particular, the judge found that United Youth "promised [clients] free housing on the condition that their Medicaid could be billed." J.A. 877–78. So the judge upheld the sanctions.

6

Following this investigation, a grand jury indicted Booker for: conspiracy to defraud the United States, to commit health care fraud, and to pay illegal kickbacks (Count One); five counts of violating the Anti-Kickback Statute arising from kickback payments to Jordan (Counts Two through Six); one count of conspiracy to launder money (Count Seven); and three counts of concealment money laundering (Counts Eight through Ten).

At trial, Booker represented himself, with the assistance of standby counsel. During the government's case-in-chief, Booker cross-examined Graves about audits of United Youth to prove that the company hadn't engaged in wrongdoing. On redirect, the government asked Graves about the North Carolina Medicaid investigation and the administrative law judge's ruling. The government had Graves read a paragraph from the ruling to the jury. Booker objected, but the court overruled the objection since Booker opened the door by eliciting testimony that United Youth hadn't faced adverse audit findings.

After the government rested, Booker moved for a judgment of acquittal, which the court denied. Booker then testified in his own defense. He claimed that he relied on the advice of counsel, was an absentee owner, and didn't intend to break the law.

The government called United Youth's lawyer as a rebuttal witness. He testified that he didn't provide "any advice related to [United Youth's] compliance with the anti-kickback statute." J.A. 1269.

The jury convicted Booker on all counts, and Booker renewed his motion for judgment of acquittal. The district court was unmoved. *United States v. Booker*, 679 F. Supp. 3d 453, 456 (W.D.N.C. 2023).

7

E.

A probation officer prepared a presentence report that included a three-level enhancement based on a loss to a federal health care program exceeding $7 million under U.S.S.G. § 2B1.1(b)(7)(B)(ii).  Booker, now represented by counsel, unsuccessfully objected to the probation officer's loss-amount calculation on the grounds that there was no "analysis breaking down legitimate and illegitimate expenses to Medicaid" and the "kickback amounts of less than $3 million" did not support more than "$9 million in total claims."  J.A. 1610.

The final presentence report included a 20-level enhancement based on a loss amount exceeding $9.5 million under U.S.S.G. § 2B1.1(b)(1)(K).  Booker objected to the loss amount calculation before the district court.  But the court overruled the objection, finding that United Youth used Johnson's provider credentials to file about $11.8 million in fraudulent claims.  Still, the court reduced Booker's offense level by two based on Booker's lack of prior criminal history.  The resulting offense level was 37, with a guideline range of 210 to 262 months' imprisonment.

The court varied downward to address the sentencing disparity between drug users, who can earn time off their sentences, and non-drug users like Booker, who can't.  It imposed a 200-month prison sentence.

This appeal followed.

II.

Booker first challenges the district court's denial of his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.  This rule requires a district court

8

to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). We review a denial of such a motion de novo. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020).

### A.

Parts of Booker's Rule 29 motion questioned the factual sufficiency of the government's evidence. When deciding this kind of challenge, we "uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, the verdict is supported by substantial evidence." *United States v. Robinson*, 55 F.4th 390, 401 (4th Cir. 2022) (quotation omitted). And we overturn the verdict only if no rational jury could find the elements of the crime satisfied beyond a reasonable doubt. *Millender*, 970 F.3d at 528. "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quotation omitted).

### 1.

We begin with Booker's conviction for conspiracy in violation of 18 U.S.C. § 371. Booker was charged with, and convicted of, conspiring to defraud the United States, commit health care fraud, and pay illegal kickbacks.

Booker argues that the evidence supporting this conviction is insufficient because (1) Medicaid paid United Youth and not him, (2) Booker never billed Medicaid himself, and (3) there was no testimony linking Booker to orders for medically unnecessary drug tests. Booker suggests Graves was the real culprit, since Graves "kept track of all referrals

9

and was responsible for what was subsequently submitted to [North Carolina] Medicaid." Appellant's Br. at 14.

But the jury heard abundant evidence that Booker owned United Youth and set the company's drug-testing policies. Graves testified that Booker required that all referred beneficiaries be tested twice per week (and instructed which tests to run) regardless of individual medical need. This testimony is direct evidence of an unlawful agreement and Booker's willful participation in the same. That the jury found Graves credible isn't a basis for disturbing its findings.

What's more, Booker ignores overwhelming evidence of his role in paying illegal kickbacks. Multiple witnesses testified that Booker negotiated kickback arrangements with Do It 4 the Hood and Legacy Housing, wherein United Youth paid these entities for their help finding Medicaid beneficiaries to be drug tested. The jury also heard ample evidence of Booker's awareness of, and involvement in, making kickback payments to both entities.

Booker himself testified that he deposited $1 million into his personal bank account the same day $1 million was withdrawn from United Youth's account. This testimony is powerful circumstantial evidence that Booker was involved in the Medicaid fraud scheme. His attempts to direct blame elsewhere are unconvincing.

Even if Booker didn't personally submit fraudulent Medicaid claims, it's blackletter law that a conspiracy defendant is "responsible for the acts of his co-conspirators in pursuit of their common plot." *Smith v. United States*, 568 U.S. 106, 111 (2013). Booker is

therefore liable for the submission of fraudulent claims by United Youth employees (like Graves) in furtherance of the conspiracy.[5]

2.

Next, Booker challenges the sufficiency of the evidence supporting his convictions for paying illegal kickbacks to Jordan.[6] The Anti-Kickback Statute prohibits "pay[ing] any remuneration"—"including any kickback"—"to any person to induce such person to refer an individual" for services that are reimbursable by Medicaid. 42 U.S.C. § 1320a-7b(b)(2)(A).

Multiple witnesses testified that Booker negotiated kickback deals with Legacy Housing. Graves testified that Booker authorized every kickback check. And Jordan testified that she dealt with Booker about "money issues," including whether the amounts United Youth paid her were accurate. J.A. 459. From this evidence, a rational jury could infer that Booker was involved in the five kickback payments to Jordan.

---

[5] Booker takes a "passing shot" at an argument that he relied on the advice of his counsel, so that issue is forfeited. *United States v. Perry*, 92 F.4th 500, 511 n.4 (4th Cir. 2024). Regardless, Booker's lawyer testified that he never gave United Youth advice about the propriety of the company's payments to recruiters. In this posture, we accept that testimony as true. We're hard pressed to see how Booker relied on advice counsel never gave.

[6] Booker also appears to challenge the evidence of payments to Do It 4 the Hood, but he was convicted of paying illegal kickbacks only to Legacy Housing.

11

Once more, Booker argues that others made the illegal kickback payments to Jordan. He again tries to pin the blame on Graves. But the jury was free to credit the evidence implicating Booker in the kickbacks.

Booker likewise insists that he didn't intend to violate the law. But even if this protest is a defense, it rings hollow. Both Graves and Jordan testified that Booker orchestrated a scheme to pay Jordan for each Medicaid beneficiary living in Legacy Housing facilities, and beneficiaries could live in the facilities only if they agreed to be drug tested. On this evidence, the jury could easily conclude Booker intended to pay Jordan kickbacks.

Booker also makes the curious claim that paying sales representatives "was common practice in the industry," Appellant's Br. at 15, perhaps referring to carve-outs in the Anti-Kickback Statute or regulatory exceptions promulgated by the Department of Health and Human Services. Later in his brief, he references those regulatory exceptions, contending that 42 C.F.R. § 1001.952 "sets forth dozens of permitted payment practices which arguably include the agency referral agreements in [his] case." *Id.* at 20.

But Booker doesn't specify which of the statutory carve-outs or regulatory safe harbors would apply on this record. That might be because there likely aren't any. In any event, by failing to point us to any such exception, Booker has forfeited the argument. *United States v. Perry*, 92 F.4th 500, 511 n.4 (4th Cir. 2024).

Insofar as Booker's claim is that he had a permissible bona-fide agency relationship with Jordan, the jury evidently rejected that claim. We see no reason to conclude otherwise.

12

We therefore reject Booker's argument that the evidence is insufficient as to the Anti-Kickback Statute convictions.[7]

B.

Booker separately challenges the legal sufficiency of his Anti-Kickback Statute convictions on the ground that the statute violates the nondelegation doctrine. This doctrine "bars Congress from transferring its legislative power to another branch of Government," but there is no bar if "Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019) (plurality opinion). If "Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority,'" along with "sufficient standards" to determine whether an agency has followed the law, then Congress's delegation of its legislative power doesn't violate the Constitution. *FCC v. Consumers' Rsch.*, Nos. 24-354 and 24-422, 2025 WL 1773630, at *8 (U.S. June 27, 2025) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

The intelligible-principle standard isn't demanding. The Supreme Court has struck down statutes for nondelegation reasons only twice, in contexts where Congress essentially provided no guardrails for the exercise of discretion. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).

---

[7] Again, Booker claims in passing that he relied on the advice of United Youth's counsel; again, the issue is forfeited, *Perry*, 92 F.4th at 511 n.4; and again, the merits of such a defense are unsupported considering counsel's testimony that he didn't give advice "related to [United Youth]'s compliance with the anti-kickback statute," J.A. 1269.

Booker argues that the Anti-Kickback Statute "gives [the Department of Health and Human Services] wide discretion in determining what conduct should be considered criminal." Appellant's Br. at 20. But the fact that the Department has broad discretion to promulgate regulations under the Anti-Kickback Statute doesn't mean that the statute lacks an intelligible principle to guide that discretion.

Congress set out nine such principles in 42 U.S.C. § 1320a-7d(a)(2), including the impact of regulations on access to and quality of health care services, patient choice in health care providers, and costs to federal health care programs. We therefore reject Booker's argument that the Anti-Kickback Statute violates the nondelegation doctrine.

## C.

Booker also challenges the legal sufficiency of his money-laundering convictions. The money-laundering statute criminalizes certain financial transactions involving the "proceeds of specified unlawful activity" undertaken "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1). The statute identifies two main types of money laundering: (1) promotional money laundering, where the defendant engages in a laundering transaction "with the intent to promote the carrying on of specified unlawful activity," and (2) concealment money laundering, which occurs when the laundering transaction is meant "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds," or "to avoid a transaction reporting requirement." *Id*.

14

Booker doesn't argue that the evidence supporting his money-laundering convictions was insufficient. Instead, he contends that the money-laundering charges implicate a "merger problem."

This problem arises when a defendant "pays for the costs of a crime with its proceeds," which subjects the defendant to criminal liability twice for the same conduct, once for violating the underlying statute and again for violating the money-laundering statute—thereby violating the Double Jeopardy Clause. *United States v. Santos*, 553 U.S. 507, 516 (2008) (plurality opinion); *see also id.* at 527 (Stevens, J., concurring in the judgment) (acknowledging that where the merger problem arises it "is in practical effect tantamount to double jeopardy.").

The *Santos* Court faced the question whether "proceeds" in the money-laundering statute referred to "receipts" or "profits." *Id.* at 509. Finding the statute ambiguous and applying the rule of lenity, a plurality concluded that "proceeds" means "profits." *Id.* at 514. Justice Stevens concurred in the judgment but would have held that the meaning of "proceeds" turns in each case on whether the definition would give rise to the merger problem. *Id.* at 525–27 (Stevens, J., concurring in the judgment).

But Congress amended the statute after *Santos* to define "proceeds" to include the "gross receipts" of unlawful activity, effectively overruling *Santos*'s conclusion. *United States v. Abdulwahab*, 715 F.3d 521, 531 n.8 (4th Cir. 2013). Booker ignores that the definition of "proceeds" in the statute now unambiguously includes "gross receipts"

15

obtained "through some form of unlawful activity," including the kickback payments here.[8] 18 U.S.C. § 1956(c)(9). We therefore reject Booker's argument that his money-laundering convictions present a merger problem under *Santos*.

But even if some part of *Santos*'s animating concerns survived Congress's amendment, we'd reject Booker's argument because he was convicted of concealment money laundering, not promotional money laundering. Under the pre-amendment definition, a merger problem could arise only when fraud proceeds were used to "promote" the fraud itself, as in when a defendant paid a kickback to induce an agent to participate in the fraud scheme. 18 U.S.C. § 1956(a)(1)(A)(i); *e.g.*, *Abdulwahab*, 715 F.3d 521, 531; *United States v. Cloud*, 680 F.3d 396, 406 (4th Cir. 2012).

But when a fraud defendant engages in conduct unnecessary to the execution of the scheme to "conceal or disguise" the fraud proceeds or to "avoid a transaction reporting requirement," *id.* § 1956(a)(1)(B), that conduct may be prosecuted separately as concealment money laundering without giving rise to a merger problem. *See United States v. Esquenazi*, 752 F.3d 912, 936 (11th Cir. 2014), *superseded by statute*, 18 U.S.C. §§ 1956, 1957.

Here, Booker hid the nature of the kickback payments (i.e., using misleading memo entries on checks) and structured payments to avoid financial reporting requirements (i.e.,

---

[8] Our cases addressing the merger problem that postdate Congress's amendment concerned pre-amendment conduct, so the pre-amendment understanding of the meaning of "proceeds" applied. *E.g.*, *United States v. Simmons*, 737 F.3d 319, 324 (4th Cir. 2013). Booker's charges stem from his conduct in 2019, so the amended definition applies here.

directing Graves not to cut checks greater than $10,000, and later, greater than $5,000). Booker didn't need to engage in this conduct to execute the Medicaid fraud scheme. So Booker's argument doesn't even implicate the merger problem discussed in *Santos*.

\*      \*      \*

Booker throws much against the wall to persuade us to reverse the district court's denial of his motion for judgment of acquittal. None of it sticks. We therefore affirm the district court's ruling on the motion.

## III.

Booker also appeals two evidentiary rulings, each on prejudice and Confrontation Clause grounds. We review the district court's admission of evidence over a party's unfair prejudice objection for abuse of discretion. *United States v. Hart*, 91 F.4th 732, 742 (4th Cir. 2024). But we review alleged Confrontation Clause violations de novo. *United States v. Mouzone*, 687 F.3d 207, 213 (4th Cir. 2012).

A court may exclude evidence if "unfair prejudice" substantially outweighs the evidence's probative value. Fed. R. Evid. 403. And while "all evidence suggesting guilt is prejudicial to a defendant," *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008) (quotation omitted), evidence will be excluded under Rule 403 only when the unfair prejudice it causes "*substantially*" outweighs its probative value, *United States v. Chaudhri*, 134 F.4th 166, 184 (4th Cir. 2025) (quotation omitted).

17

Separately, the Sixth Amendment's Confrontation Clause generally prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). But the Clause, like the rule against hearsay, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010) (quoting *Crawford*, 541 U.S. at 60 n.9).

Considering these principles, we discern no error in the challenged evidentiary rulings.

### A.

We turn first to the district court's decisions to permit testimony about an adverse audit and to admit an excerpt from the administrative law judge's ruling related to the audit.

While cross examining Graves, Booker elicited testimony about United Youth audits conducted by the managed-care organization that oversaw the company on behalf of North Carolina Medicaid. Booker had Graves confirm that neither "[t]he state" nor the managed-care organization ever told him United Youth "was doing kickbacks." J.A. 785–86; *see also* J.A. 809 ("Q. In any of those audits, did they ever say we were doing kickbacks? A. No, sir.").

On redirect, the government asked Graves to confirm whether "there [were] some [audit] findings that were appealed by the company to an administrative court," and whether the administrative "court ruled eventually that United Youth Care Services could no longer provide services." J.A. 874. Graves did so.

18

Over Booker's objection, the government then introduced a heavily redacted form of the "final order from the administrative proceeding." J.A. 874. In a sidebar, the government explained that its line of questioning was in response to Booker's questions on cross-examination. The court allowed the line of questioning.

The government had Graves read to the jury a paragraph from the administrative judge's final order. The paragraph specified that United Youth "subjected clients to exploitation" and "exercised dominion over all things housing for clients"; that "[t]he CEO/President was responsible for and paid for substandard housing"; and that "[c]lients with Medicaid were recruited and promised free housing on the condition that their Medicaid could be billed." J.A. 877–78; *see also* S.A. 46.

We see no unfair prejudice. Booker elicited testimony from Graves suggesting that, based on the results of audits into the company's practices, senior employees at United Youth didn't know that the company was engaged in wrongdoing. With Booker having opened the door into the audit results, the government was free to challenge the testimony Booker elicited through its own exploration of those results. *See United States v. Blake*, 571 F.3d 331, 348 (4th Cir. 2009).

We likewise see no violation of the Confrontation Clause. Booker claims he was unable to cross-examine the administrative law judge whose ruling was partly read into the record. But even if the judge's ruling was testimonial (which we doubt), the government didn't offer it for the truth of the matters asserted. Instead, the government offered it to show that the higher-ups at United Youth were on notice of possible wrongdoing.

19

"Accordingly, the admission of [this evidence] did not violate the Confrontation Clause." *Ayala*, 601 F.3d at 272.

B.

Booker also challenges the district court's admission of testimony that he deposited $1 million into his personal bank account on the same day that $1 million was debited from United Youth's account.[9]  He argues the testimony was unduly prejudicial since it would lead the jury to conclude that he was personally benefitting from the Medicaid fraud scheme, when his $1.5 million line of credit with the bank was, he claimed, the source of the funds.  He also suggests that a representative from the bank had to testify to avoid a Confrontation Clause issue.

We don't find the admission of this evidence to be unduly prejudicial.  There was no evidence that Booker drew on his line of credit, so his claim that the line of credit was the source of his $1 million deposit lacks record support.  In any event, the deposit of $1 million into his own account the same day $1 million was withdrawn from United Youth's is highly probative of Booker's intent or motive to commit Medicaid fraud.

---

[9] The government argues that Booker's challenge should be reviewed for plain error, rather than harmless error, since he failed to object to the admission of this testimony at trial. *See United States v. Robinson*, 460 F.3d 550, 557 (4th Cir. 2006).  Booker's standby counsel did "object to this line of questioning," albeit after Booker testified about the $1 million transactions.  J.A. 1250.  We needn't decide which standard of review applies because Booker's challenge fails either way.

The jury could decide whether Medicaid fraud or the line of credit was the more likely source of the $1 million deposit. This evidence was not substantially more unfairly prejudicial than it was probative.

As to the Confrontation Clause issue, we agree with the government that this "evidence was not an out-of-court testimonial statement by a witness who was not available for cross-examination." Appellee's Br. at 60. Bank account transaction ledgers aren't generally "create[ed as] an out-of-court substitute for trial testimony," and therefore aren't testimonial statements subject to the Confrontation Clause. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (quotation omitted); *see also, e.g.*, *United States v. Naranjo*, 634 F.3d 1198, 1213–14 (11th Cir. 2011) (explaining that business records aren't testimonial). Further, Booker had control over both bank accounts relevant to these transactions and was therefore able to testify about them. Finally, we agree with the government that this evidence suggesting Booker personally benefitted from the Medicaid fraud scheme "is relevant to prove motive and intent," and therefore wasn't offered for the truth of the matter. Appellee's Br. at 60.

So we reject Booker's challenge to the admission of this evidence.

## IV.

Lastly, Booker objects to his sentence on two grounds. He argues that the district court clearly erred in finding that the Medicaid fraud scheme caused a loss of at least $9.5 million. He also argues that his downward-variant sentence is substantively unreasonable. Neither challenge has merit.

21

A.

We review the district court's loss-amount finding for clear error. *United States v. Otuya*, 720 F.3d 183, 191 (4th Cir. 2013). A district court clearly errs when, "although there is evidence to support [the factual finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Walsh v. Vinoskey*, 19 F.4th 672, 677 (4th Cir. 2021) (quotation omitted).

Booker's presentence report calculated the loss to Medicaid to exceed $9.5 million. Booker objected to the calculation because there was no breakdown of the loss amount into legitimate and illegitimate parts. He renews that objection here, arguing that a lower loss amount should apply based on the kickbacks United Youth paid instead of the claims it submitted to Medicaid.

Under U.S.S.G. § 2B1.1(b), the offense level increases by 20 if the "loss" exceeded $9.5 million. U.S.S.G. § 2B1.1(b)(1)(K). The guideline itself doesn't define "loss." Instead, the definitions are found in the guideline's commentary, which defines "loss" to mean "the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. 3(A) (2023). "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. 3(A)(i). "Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." *Id.* § 2B1.1 cmt. 3(A)(ii).

Applying this commentary, we've previously explained that a district court doesn't "clearly err in relying on the amount . . . billed [to] Medicare and Medicaid as prima facie evidence of the amount of loss [a defendant] intended to cause." *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003). But the amount billed "does not constitute conclusive

22

evidence of intended loss," so "the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent." *Id.*

Since *Miller*, however, the significance of the commentary has undergone a sea change. In *Kisor v. Wilkie*, the Supreme Court limited the deference courts once afforded to agencies' interpretations of their own regulations. 588 U.S. 558, 573 (2019). We've held that *Kisor* applies to the sentencing guidelines commentary. *United States v. Campbell*, 22 F.4th 438, 444–45 (4th Cir. 2022); *see also United States v. Mitchell*, 120 F.4th 1233, 1239–40 (4th Cir. 2024).

We've also held, post-*Kisor*, that the meaning of "loss" in § 2B1.1 is genuinely ambiguous, so we apply the guidelines commentary's definition of the term. *United States v. Boler*, 115 F.4th 316, 328–29 (4th Cir. 2024). Therefore, in this circuit, we interpret "loss" to refer to "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A) (2023).

Booker urges us to adopt the approach of one of our sister circuits, which limits the definition of "loss" in § 2B1.1 to "the loss the victim actually suffered." *United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022). But Booker can't overcome our panel precedent in *Boler*. *See Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) ("[W]e must apply [prior panel precedents] as a mechanical mandate.").

We therefore reaffirm that the loss amount for which a defendant is sentenced can be based on "the amount of loss [a defendant] intended to cause," which here was the just over $12 million United Youth billed to Medicaid for medically unnecessary tests. *Miller*, 316 F.3d at 504.

23

But even if we were to accept Booker's invitation to adopt the Third Circuit's approach, we see no basis for holding him responsible for only the portion of the Medicaid proceeds paid as kickbacks. A representative from the North Carolina Medicaid Investigations Division testified at trial that from 2016 to 2019, United Youth was paid just under $12 million by North Carolina Medicaid for medically unnecessary drug tests. This testimony goes to the actual loss Medicaid suffered based on United Youth's submission of fraudulent claims and satisfies the government's burden of proving the loss amount by a preponderance of the evidence. *United States v. Stone*, 866 F.3d 219, 228 (4th Cir. 2017). So the district court didn't clearly err in its loss-amount calculation.

## B.

Booker's final challenge is to the substantive reasonableness of his sentence. We review that issue for abuse of discretion. *United States v. Zuk*, 874 F3d 398, 409 (4th Cir. 2017). We generally presume that a sentence within or below the guidelines range is substantively reasonable. *United States v. Gutierrez*, 963 F.3d 320, 344 (4th Cir. 2020).

In imposing a sentence, district courts must consider several factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

Booker's guidelines range was 210 to 262 months' imprisonment, and the district court imposed a sentence of 200 months' imprisonment. Booker claims that his sentence is "excessive when compared with that of his co-defendants," who were sentenced to 30

24

months' imprisonment (Graves and Jordan) and 70 and 78 months' imprisonment (Do It 4 the Hood's two leaders). Appellant's Br. at 27.

But Booker "focuses on the wrong kind of disparity." *United States v. Lawson*, 128 F.4th 243, 257 (4th Cir. 2025). A sentence isn't unreasonable "merely because it creates a disparity with a co-defendant's sentence." *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022) (quotation omitted). The goal of § 3553(a) is "to eliminate unwarranted sentencing disparities *nationwide*." *Lawson*, 128 F.4th at 257 (quotation omitted). Booker's argument that his sentence is excessive considering those imposed on his co-defendants misses the mark.

In any event, the district court justified any sentencing disparity because each of the co-defendants was "part of a cog in a wheel and [Booker was] the wheel." J.A. 1592. The court added that the co-defendants pleaded guilty and cooperated with the government's prosecution of Booker, which led them to benefit from "motions from the government to reduce their sentences," unlike Booker. J.A. 1592. We agree with the district court that Booker's co-defendants were not similarly situated to him, and so their lower sentences don't move the needle as to the reasonableness of Booker's sentence.

Booker also points to his age, "his family support[,] and his lack of criminal history." Appellant's Br. at 27. But he offers no reason why these personal characteristics suffice to disturb the district court's sentence. The district court properly considered all these qualities and still concluded that a prison term of 200 months was warranted. We conclude that Booker's sentence is substantively reasonable.

25

V.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*